In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1927

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TOMMY WEBSTER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:11-cr-00067-RLM-1— **Robert L. Miller, Jr.**, *Judge.*

ARGUED SEPTEMBER 9, 2014 — DECIDED JANUARY 5, 2015

Before FLAUM, ROVNER, and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge.* On May 9, 2012, Tommy Lee
Webster, Jr. was charged in a superseding indictment with five
counts, including: possession with intent to distribute cocaine
in violation of 21 U.S.C. § 841(a)(1); possession of a firearm in
furtherance of a drug trafficking offense, in violation of
18 U.S.C. § 924(c); manufacture of marijuana, in violation of
21 U.S.C. § 841(a)(1); possession with intent to deliver cocaine

base, in violation of 21 U.S.C. § 841(A)(1); and possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). A jury convicted him on all counts, and he was sentenced to 168 months' imprisonment followed by three years of supervised release. Webster now appeals that conviction.

Webster's arrest occurred on March 11, 2011, when police officers went to a residence at 816 Almond Court in South Bend, Indiana, in response to an anonymous tip. As two officers proceeded to the front door, a third officer heard a door close and went to the yard on the side of the house where he encountered Webster. Webster had $2,296 in cash on his person at the time, and the officers smelled a strong odor of marijuana coming from the house and on Webster's clothing. Webster produced a driver's license that indicated he resided at 816 Almond Court. Two individuals exited the house and began running from the residence. One fled back inside the house and ultimately escaped through a second-floor window, but the other, Frederick Jones, was apprehended. The officers placed Jones and Webster in the caged back seat of a squad car while they sought a search warrant for the residence. An officer, Corporal Hammer, was in the patrol car with them for approximately 2-1/2 hours before and during the search, and at some point he employed the internal video camera in the car to record all conversations in the vehicle. He was absent from the car for approximately 8 minutes, and during that time Webster engaged in conversation with Jones and placed several phone calls which are audible in the recording. The government subsequently moved to enter that 8-minute excerpt into evidence, as well as a transcript of that recording

prepared by Corporal Hammer, Officer Kronewitter, and a third officer. Defense counsel offered no objection, and the district court allowed the evidence. Before playing the tape, the court informed the jury that the recording was evidence but the transcript was not evidence and that it merely reflected what a few people believe is on the tape. The jury was further instructed that in the case of a conflict, they should "go with what you hear, rather than what you see."

The search of the residence revealed a marijuana grow operation, including 50 rooted plants, 38 cuttings, high-pressure sodium grow lights on timers, chemicals, and a computer that displayed the video from surveillance cameras. In addition, the officers found marijuana in the pocket of a coat in the first floor closet, and plastic baggies and electronic scales in the kitchen. Of the three upstairs bedrooms, only one contained a bed. In that bedroom, the officers found a bag containing several smaller plastic bags of marijuana next to the bed, loose marijuana and another container of marijuana near the bed, and, in the pocket of a coat hanging in the closet, a plastic bag containing several smaller bags filled with white and brown powder substances. A loaded shotgun was found in that bedroom and an unloaded shotgun was found in the closet.

Webster challenges his convictions on the drug and firearms charges on three grounds. He asserts that the district court erred in allowing the admission into evidence of forensic laboratory reports as well as a recording of the conversation involving Webster in the squad car. In addition, he contends that the evidence was insufficient to support the convictions. We address these arguments in turn.

We begin with the challenge to the admission of the forensic laboratory reports. The suspected drug evidence was sent to the Indiana State Police laboratory and Kristen Sturgeon, a forensic scientist, prepared two laboratory reports identifying the drugs. Although Sturgeon was disclosed as a potential government expert witness prior to trial, she was never called to testify during the trial. Instead, the two lab reports were admitted into evidence during the testimony of Indiana State Police Trooper Brian Hoffman and South Bend Police Sergeant Michael Steven Suth.

The first report was admitted into evidence during the testimony of Trooper Hoffman. He related his observations of the marijuana grow operation at the residence in detail and testified that he transported the plants back to his office and dried them prior to sending them to the laboratory. The government then sought to admit Sturgeon's report attesting that the evidence contained 816 grams of marijuana. In response to the request to admit the report into evidence, Webster's counsel stated "I think I agreed to this, didn't I? No objection."

Later in the trial, Sergeant Suth testified as to the lab results for the powdered substance found in the residence. Suth was an evidence technician in the Metro Special Operations Section of the South Bend Police Department, and at the residence he was responsible for securing the evidence and subsequently weighing, field testing, and processing it. He testified that the evidence was then taken to the Indiana State Police Lab and examined by Sturgeon, and he identified the lab report containing the results of the testing. The government then moved to have the report admitted into evidence, and defense

counsel stated "[n]o objection." The court held that the exhibit was admitted without objection. Suth proceeded to testify as to the findings in Sturgeon's lab report identifying the white and brown powder substances as cocaine and cocaine base.

Webster now contends that the admission of Sturgeon's laboratory reports without her testimony or a stipulation as to the admissibility violated the Sixth Amendment Confrontation Clause of the Constitution. The government concedes that Sturgeon's lab reports were not properly admitted, but argues that the error does not require reversal.

As the government acknowledges, we have repeatedly held that "the government may not introduce forensic laboratory reports or affidavits reporting the results of forensic tests and use them as substantive evidence against a defendant unless the analyst who prepared or certified the report is offered as a live witness subject to cross-examination." *United States v. Maxwell*, 724 F.3d 724, 726 (7th Cir. 2013); *Bullcoming v. New Mexico*, ___ U.S. ___, 131 S. Ct. 2705, 2710 (2011); *United States v. Moon*, 512 F.3d 359, 360-62 (7th Cir. 2008). In failing to call Sturgeon in the trial, the government ran afoul of that proscription.

In general, when a defendant fails to object to the admission of evidence at trial, we review only for plain error. In this case, it appears that the decision not to object was intentional. When the government first moved to admit the lab reports into evidence, defense counsel stated that he thought he had agreed to it and that he had no objection. He reiterated that he had no objection when the government moved to admit the remaining lab report. That affirmative decision to forego an objection

would normally be considered a waiver rather than a forfeiture. See *United States v. Locke*, 759 F.3d 760, 763 (7th Cir. 2014) ("a defendant who affirmatively states 'I do not object' or 'I withdraw my objection' has not forfeited the right, but rather intentionally relinquished or waived the right and cannot ask for review.") "'[W]aiver occurs when a defendant intentionally relinquishes or abandons a known right, whereas forfeiture occurs when a defendant simply fails to timely assert his rights.'" *United States v. Pappas*, 409 F.3d 828, 829 (7th Cir. 2005), quoting *United States v. Harris*, 230 F.3d 1054, 1058 (7th Cir. 2000). A forfeiture generally reflects an oversight, whereas a waiver encompasses a deliberate decision not to present a ground for relief. *Id.* In contrast to forfeited issues that we review for plain error, we do not review issues that are waived at all because a valid waiver leaves no error to correct on appeal. *Id.* at 830.

Although the decision not to object appears to be an intentional decision which would constitute a waiver, the government did not argue that we should construe it as a waiver. Instead, the government asserted that we should review the admission of the evidence for plain error. In arguing that we should review for plain error, the government has waived the argument that the objection should be considered to have been waived. *United States v. Murphy*, 406 F.3d 857, 860 (7th Cir. 2005)(government "waived waiver" by asserting that we should apply the plain error standard of review). Accordingly, we will review the challenge under the plain error standard.

Under that standard, we will reverse only if there is error that is plain, that affects the defendant's substantial rights, and that seriously affects the fairness, integrity or public reputation of judicial proceedings, resulting in a miscarriage of justice. *United States v. Iacona*, 728 F.3d 694, 699 (7th Cir. 2013). An error affects substantial rights if it is prejudicial, "that is, when it has affected the outcome of the district court proceedings." *United States v. McLaughlin*, 760 F.3d 699, 706 (7th Cir. 2014).

The government contends, correctly, that the error here could not have affected Webster's substantial rights, because Webster never contested that the substances were in fact drugs. Webster conceded in opening statements, and referenced again in closing arguments, that there were drugs found in the home. Rather than wage a doomed battle as to the nature of the substances in the home, defense counsel focused on the argument that Webster was not connected to those drugs or the residence and that other persons were responsible for the drug operation.

The decision by defense counsel has a strategic benefit. "Hearsay usually is weaker than live testimony, and defendants may prefer the hearsay version rather than making an objection that would compel the prosecution to produce a stronger witness." *Moon*, 512 F.3d at 361. Where the nature of the substance cannot realistically be challenged, defense counsel may well choose to focus the defense on the most vulnerable areas of the government's case. Given the extensive grow operation found in the home, it certainly would have been reasonable for defense counsel to conclude that it would be futile to focus an attack on the nature of the substances found there.

In *Maxwell*, 724 F.3d at 724-28, we addressed an analogous situation. Maxwell was prosecuted for possession with intent to distribute crack cocaine. *Id.* at 725. His strategy at trial was to contest whether he had the intent to distribute, rather than to challenge the nature of the substance involved. *Id.* at 727-28. We held that as there was no question at trial as to the type of drugs being distributed, the admission of the laboratory report evidence could not constitute plain error. *Id.* at 728. The same outcome is mandated here. There could be no harm to Webster in this case, because the failure to present the testimony of the analyst who prepared the report had no impact on his defense, which did not challenge the existence of the drugs but contested only his connection to them. Nothing in the report addressed his connection to the drugs. Only the nature of the substances was presented in the testimony regarding the lab report, and that was not a contested issue at trial. Accordingly, the error in the admission of the forensic report evidence does not require reversal.

Webster next contends that the district court erred in allowing the consideration of the taped and transcribed conversation that occurred in the squad car. He asserts that the recording of that conversation violated his Fourth Amendment right to be free from unreasonable searches and seizures. He notes that electronic surveillance can constitute a search within the purview of the Fourth Amendment, and maintains that the surveillance in this case constituted an unreasonable search.

In order to succeed on this claim, Webster has to establish that he had a reasonable expectation of privacy in the conversation that took place in the caged portion of the squad car. A reasonable expectation of privacy exists when the defendant

manifested a subjective expectation of privacy and society recognizes that expectation to be reasonable. *United States v. Walton*, 763 F.3d 655, 658 (7th Cir. 2014). Therefore, it contains both a subjective and objective component. We assume for purposes of the analysis here that Webster in fact manifested a subjective expectation of privacy, which was evidenced by his silencing of the conversation when the officer was in the patrol car, as would be expected from someone seeking to keep a conversation private. *Id.* (the subjective prong looks to the individual's affirmative steps to conceal and keep private that which was the subject of the search).

Instead, the insurmountable obstacle to his claim is in the objective portion of the test—whether the expectation is one that society accepts as reasonable. Although our circuit has not yet addressed this question, six circuits have done so over the last two decades and all have held that there is no objectively reasonable expectation of privacy in a conversation that occurs in a squad car. See *United States v. Dunbar*, 553 F.3d 48, 57 (1st Cir. 2009); *United States v. Turner*, 209 F.3d 1198, 1200-01 (10th Cir. 2000); *United States v. Clark*, 22 F.3d 799, 801-02 (8th Cir. 1994); *United States v. McKinnon*, 985 F.2d 525, 527-28 (11th Cir. 1993); *United States v. Fridie*, 442 Fed. Appx. 839, 841 (4th Cir. 2011)(unpublished); *United States v. Carter*, 117 F.3d 1418 (5th Cir. 1997)(unpublished). The reasoning of those courts are instructive. The Tenth Circuit in *Turner* based its holding on the distinct nature of a squad car, which is a place bristling with electronics in which the practical realities of the situation should be apparent to occupants. 209 F.3d at 1201. It noted that in addition to the microphones to a dispatcher, it is increasingly common for squad cars to possess video recording

devices (and in fact one such device was used to record the conversation in this case,) and other electronic and recording devices. *Id.* Moreover, as a number of circuits have recognized, the squad car is in essence the mobile office of the patrol officer, and the back seat is often used as a temporary jail for housing and transporting arrestees and suspects. *Clark,* 22 F.3d at 801-02; *McKinnon*, 985 F.2d at 527. Given the nature of the vehicle and the visible presence of electronics capable of transmitting any internal conversations, the expectation that a conversation within the vehicle is private is not an expectation that society would recognize to be reasonable. We agree with those circuits, and hold that conversations in a squad car such as the one in this case are not entitled to a reasonable expectation of privacy, and therefore the recording of the conversation is not a violation of the Fourth Amendment.

We note that this holding reflects the layout and equipment of the squad car, and express no opinion as to conversations that occur in other vehicles. For instance, Webster relied largely on a district court opinion in *United States v. Williams*, 15 F. Supp. 3d 821 (N.D. Ill. 2014), in which the court held that there is a reasonable expectation of privacy in conversations that take place in a squadrol or patrol wagon. That decision, however, is inapposite. The *Williams* court emphasized in its decision that the squadrol had three compartments including two separate rear compartments for prisoners that were physically separated from the front portion of the vehicle in which the officers rode. *Id.* at 825. The prisoner compartment was separated from the front part by a wall and windows with thick plexiglass through which officers could see but not hear the prisoners, and there were no electronics visible. *Id.* In

finding an objectively reasonable expectation of privacy, the court distinguished the squadrol from the patrol car with its electronics and visibility to the public. *Id.* at 828-30. Therefore, that case is not helpful to Webster. Because there was no expectation of privacy in the squad car, the recordings did not violate Webster's Fourth Amendment rights. Webster argues in his reply brief that the transcript of the recording should have been excluded because the government failed to provide an adequate foundation for it, but that argument was not raised in the opening brief and therefore is waived. *See United States v. Dabney*, 498 F.3d 455, 460 (7th Cir. 2007).

The final challenge presented by Webster is one to the sufficiency of the evidence. Webster asserts that the government did not produce sufficient evidence to support the possession charges because there was no evidence that he was in actual physical possession of the drugs or guns, and the government failed to demonstrate that he had exclusive control of the premises sufficient to support a finding of constructive possession. He also asserts that there was insufficient evidence to connect the guns to the drugs, and therefore to support the conviction for possession in furtherance of drug trafficking.

Ordinarily, we review a challenge to the sufficiency of the evidence to determine only whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, viewing the evidence in the light most favorable to the government. *United States v. Cejas*, 761 F.3d 717, 726 (7th Cir. 2014). In this case, however, Webster failed to file a motion for acquittal under Federal Rule of Criminal Procedure 29 at the close of evidence or within seven days of the verdict. Accordingly, we will review under the plain error

standard, and will reverse only if there is error that is plain, affects the defendant's substantial rights, and seriously affects the fairness, integrity or public reputation of judicial proceedings, effectuating a miscarriage of justice. *Iacona*, 728 F.3d at 699; *United States v. Van Allen*, 524 F.3d 814, 819 (7th Cir. 2008).

The government in this case relied on the theory of constructive possession in which an individual is deemed to "possess" contraband items without a showing of immediate, physical control of the objects. *United States v. Schmitt*, 770 F.3d 524, 534 (7th Cir. 2014). "Constructive possession may be established by demonstrating that the defendant knowingly had both the power and the intention to exercise dominion and control over the object, either directly or through others." *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012). In order to succeed under that theory, the government must demonstrate a nexus between the defendant and the contraband so as to distinguish him from a mere bystander. *Id.* That may be established by demonstrating that the defendant had exclusive control over the property where the contraband was discovered, which allows the jury to infer the knowledge and intent to control objects within those premises. *Id.* In other cases, it may be established by evidence supporting the conclusion that the defendant had the ability to exercise knowing dominion and control over the items in question. *United States v. Brown*, 724 F.3d 801, 804 (7th Cir. 2013). Mere proximity to the contraband is not enough. *Id.*; *United States v. Reed*, 744 F.3d 519, 526 (7th Cir. 2014). "Proximity must be coupled with other evidence, including connection with an impermissible item, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement

in an enterprise in order to sustain a guilty verdict." *Reed*, 744 F.3d at 526.

Webster's argument as to the sufficiency of the evidence is largely tied to his argument that the conversation in the squad car was improperly admitted, and although his argument would likely fail without that evidence, it assuredly fails in light of our determination that the conversation was properly presented to the jury. First, substantial evidence tied Webster to the residence itself, including that he was the residence's mortgagee, his driver's license listed that residence as his address, and he had a land contract with John Rees, the mortgagor, who testified that Webster was living at the residence at the time of the search. In addition, the neighbor testified that the only person he ever knew to live there was Webster. The items in the home further tied Webster to the residence. The majority of the mail in the residence was addressed to Webster. Furthermore, in the bedroom that contained the drugs and guns, there was mail addressed to Webster but no mail in the name of anyone other than Webster, and in Webster's name the officers found a receipt dated January 14, 2011, and a bank statement dated February 28, 2011. The lone coat in the closet was sized extra large, which was consistent with Webster's size and not the size of the persons found in and near the residence at the time of the search. In addition to that evidence tying Webster to the residence and the bedroom, Webster's statements in the patrol car establish a connection to the drugs in the residence. As set forth in the government brief without contradiction by Webster, in the recording Webster stated that the police were searching inside his house, that they were inside "trying to

search for shit," that "[i]t was just about to be tooken out next month when I moved—I got leases wrote up and everything," and that the police were "trying to kill my mother fucking career." In addition, he indicated that he had tried to conceal his connection to the residence, stating that "I came out from the back and said I was working on the van. No they ain't seen me coming from the house. Shit they just seen me on the porch, shit just trying to knock on the door as far as I'm concerned."

A jury could interpret those statements as an acknowledgment that the residence was Webster's, and that he was operating a drug business from that residence that he was attempting to conceal from the police. That connection to the drug business provides a motive for the possession of the guns, which along with the evidence that the bedroom was Webster's and the proximity of the gun to the drugs, is sufficient to distinguish him from an innocent bystander and establish the nexus required for constructive possession. See *Schmitt*, 770 F.3d at 534 (testimony that the defendant was a drug dealer and that drugs were found in his home was relevant to provide a motive for the presence of a firearm for establishing constructive possession). Moreover, the proximity of the firearms to drugs in the bedroom, particularly where as here the home also contained an extensive grow operation including a video surveillance system, provides an adequate basis for the jury to conclude that the guns were possessed in furtherance of the drug offense. There is no basis to conclude that there was a miscarriage of justice under the plain error standard.

Accordingly, the decision of the district court is AFFIRMED.