In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 14-2913 & 15-1294

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*
*Cross-Appellee,*

*v.*

CORNELIUS PAXTON, *et al.,*

*Defendants-Appellees,*

*and*

MATTHEW WEBSTER,

*Defendant-Appellee,*
*Cross-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cr-00103 — **Robert W. Gettleman**, *Judge.*

ARGUED DECEMBER 1, 2016 — DECIDED FEBRUARY 17, 2017

Before POSNER, RIPPLE, and ROVNER, Circuit Judges.

ROVNER, *Circuit Judge.* The district court suppressed the covertly-recorded statements that the defendants made to one another while being transported in a police van immediately after their arrests, finding that the characteristics of the van supported a reasonable expectation of privacy in the defendants' conversations. The government has appealed that ruling, and defendant Matthew Webster has cross-appealed the district court's determination that his subjective expectation of privacy ended when a co-defendant warned others within the van that they were likely being recorded. Building upon our decision in *United States v. Webster*, 775 F.3d 897 (7th Cir.), *cert. denied*, 135 S. Ct. 2368 (2015), we conclude that the defendants lacked an objectively reasonable expectation of privacy in the van, and we therefore reverse the district court's decision to suppress their statements. We dismiss Webster's cross-appeal as moot.

## I.

The five defendants in this case were arrested on the evening of January 30, 2013, as they were preparing to execute a planned robbery of what turned out to be a wholly fictitious narcotics "stash house." *See, e.g.*, *United States v. Lewis*, 641 F.3d 773, 777-78 (7th Cir. 2011). They had been recruited into the scheme by an undercover agent who posed as a drug courier seeking to rob the Mexican drug cartel for which he was purportedly working. The sting was organized by a task force comprised of Chicago police officers and agents of the federal Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF").

Two of the defendants, Randy Walker and Randy Paxton, were arrested outside of a Chicago restaurant. They were placed into a police transport van that was clearly marked as a Chicago Police Department vehicle. The vehicle was a Ford E350 cargo van that had been modified for police use. The van's interior was divided into three compartments by two solid steel walls with small double plexiglass viewing windows. The driver and a passenger would occupy the front compartment, while the rear two compartments were reserved for detainees. After Walker and Paxton were loaded into the van, task force officers drove the van a short distance to a warehouse, where the other three defendants—Cornelius Paxton, Adonis Berry, and Matthew Webster—had convened with the undercover agent for a final pre-robbery meeting. Those three defendants, having also been arrested, were placed into the rear-most compartment of the van along with Walker and Randy Paxton.

Within the van, the defendants were seated on two benches facing one another from opposite sides of the van—"shoulder to shoulder, knee to knee," as the district court later put it. *United States v. Paxton*, No. 1:13-cr-00103, 2015 WL 493958, at *2 (N.D. Ill. Feb. 3, 2015) ("*Paxton II*"). All five of the defendants had their wrists handcuffed behind their backs. The district court would later determine that the defendants could expect to be overheard conversing from outside of the compartment only if they spoke in an above-normal tone of voice.

None of the defendants was given *Miranda* warnings before being placed into the van. Each defendant was, however, asked by officers to state his name and certain other identifying information before entering the van. Once all five defendants

had been loaded, the van was driven to the Chicago field office of the ATF.

During the drive, the defendants conversed quietly. Unbeknownst to them, two recording devices (one audio, and the other audiovisual) had been hidden in the rear compartment of the van so as to capture their conversation. Randy Paxton made a number of inculpatory statements to Walker while en route to the warehouse. When their three co-defendants joined Paxton and Walker in the van, conversation among all five commenced. Several minutes into their discussion, Berry remarked that the van was "probably bugged," Gov. Ex. Draft Tr. 8, and he then pointed out areas where he thought there might be surveillance cameras. Nonetheless, the defendants continued to converse and make incriminating statements. The recording equipment captured these statements as well as the identifying information each of the defendants was asked to provide prior to being seated in the van. The defendants' answers to the biographical questions were used by the ATF to identify each speaker in the ensuing conversations.

Upon arrival at the ATF field office, the defendants were interviewed individually after being apprised of their rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). The recording equipment was removed from the van and the contents were downloaded and subsequently transcribed; the equipment was then re-installed in the van for purposes of the subsequent trip to the Metropolitan Correctional Center, where the defendants would be jailed. Although the recording equipment could be configured in such a way as to broadcast the detainees' conversations in real time to the van driver and

his passenger, the equipment was not set up in that manner and was instead used only to record the detainees' conversations for use at a later date.

A grand jury charged the five defendants with (among other offenses) conspiring to possess, with the intent to distribute, 500 grams or more of cocaine, in violation of 21 U.S.C. § 846; conspiring to commit a robbery, in violation of the Hobbs Act, 18 U.S.C. § 1951(a); and possession of a firearm in furtherance of those crimes, in violation of 18 U.S.C. § 924(c)(1)(A). The section 846 charges were later dismissed without prejudice on the government's motion.

The defendants moved to suppress any recorded statements they made within the van while en route to the warehouse and ATF field office, and the district court granted that motion in part following an evidentiary hearing. Following his colleague's decision in *United States v. Williams*, 15 F. Supp. 3d 821 (N.D. Ill. 2014) (Castillo, C. J.), Judge Gettleman found that the defendants initially had both a subjective as well as an objectively reasonable expectation of privacy in their conversations within the rear compartment of the police van. *United States v. Paxton*, No. 1:13-cr-00103, 2014 WL 3807965, at *1 (N.D. Ill. July 31, 2014) ("*Paxton I*"). That expectation of privacy was reinforced by testimony from a task force officer seated in the front compartment that he could hear conversation occurring in the rear compartment at a normal volume but that he did not overhear any such conversation on the night that the defendants were arrested and transported. *Id.* "It is obvious that defendants took steps to conceal their conversation from the officers driving the vehicle by lowering their voices, and were under the impression, at least initially, that their discus-

sion was private." *Id.* Any subjective expectation of privacy on the part of the defendants ended, however, once defendant Berry placed his co-defendants on notice of the probability that they were being monitored. *Id.*, at *2. The court therefore suppressed any statements that the defendants may have uttered prior to Berry's warning—as those statements were uttered with an expectation of privacy and intercepted without judicial authorization—but not after. *Id.* The court rejected the defendants' request to suppress, as fruit of the poisonous tree, any statements they subsequently made when interviewed (following *Miranda* warnings) at the ATF field office. The court reasoned that neither the interviewing agents nor anyone else had listened to the recording of the van conversations at that point, so in that respect the interviews were not the tainted product of the recording. *Id.*

The court denied the defendants' subsequent motion to reconsider its finding that their subjective expectation of privacy ended with Berry's warning. *Paxton II*, 2015 WL 493958. After inspecting a van identical to the one used to transport the defendants, the court had no doubt that each of the defendants in the rear compartment would have heard Berry's warning. *Id.*, at *2. The inspection also confirmed the court's understanding that agents in the front compartment of the van would have been unable to overhear a conversation occurring in the rear compartment of the van so long as the detainees were speaking quietly. *Id.*

## II.

The government appeals the district court's decision to suppress any statements made by the defendants within the

police van before Berry warned his comrades that the van was likely bugged. In the government's view, detainees can have no reasonable expectation of conversational privacy within a clearly-marked police vehicle, regardless of the particular type (and configuration) of vehicle in which they are being transported. Webster, by contrast, challenges the district court's decision that his subjective expectation of privacy ended with Berry's warning about the probability of electronic surveillance.

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Subject to limited exceptions, "warrants are the general rule" in judging the reasonableness of a search or seizure. *Katz v. United States*, 389 U.S. 347, 362, 88 S. Ct. 507, 517 (1967) (Harlan, J., concurring). A search within the protection of the Fourth Amendment occurs when the government intrudes upon an individual's legitimate expectation of privacy in the object of the search. *Id.* at 352-53, 88 S. Ct. at 512 (majority); *id.* at 360–61, 88 S. Ct. at 516 (Harlan, J., concurring); *see Kyllo v. United States*, 533 U.S. 27, 33, 121 S. Ct. 2038, 2042–43 (2001); *Minnesota v. Olson*, 495 U.S. 91, 95–96, 110 S. Ct. 1684, 1687 (1990); *Smith v. Maryland*, 442 U.S. 735, 740–41, 99 S. Ct. 2577, 2580 (1979). The amendment's protections extend to government eavesdropping upon one's conversations with others, in circumstances where he has a reasonable expectation that the conversation is not subject to interception. *See Katz*, 389 U.S. at 353, 88 S. Ct. at 512 (treating interception and recording of telephone conversation in public telephone booth as a search and seizure within the meaning of Fourth Amendment); *id.* at

361, 88 S. Ct. at 516–17 (Harlan, J., concurring). In order to establish that he has a protected privacy interest in an intercepted conversation, the individual must show first that he manifested a subjective expectation of privacy in that conversation, and second, that his subjective expectation is one that society is prepared to recognize as reasonable. *E.g., Smith*, 442 U.S. at 740–41, 99 S. Ct. at 2580. If he makes these showings, then the warrantless interception and recording of his conversation will normally be considered to be an unauthorized search and as such unlawful, absent the applicability of an exception that justifies the government's failure to obtain a warrant. *See Katz*, 389 U.S. at 354-59, 88 S. Ct. at 513–15.

Paralleling the coverage of the Fourth Amendment in the realm of electronic surveillance is Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. § 2510, *et seq.*, which generally prohibits (again, with certain exceptions) the interception, disclosure, and use of wire, oral, and electronic communications absent judicial authorization or the consent of one of the parties to such communication. The statute's definition of protected oral communications, *see* § 2510(2), is "intended to parallel the 'reasonable expectation of privacy' test created by the Supreme Court in *Katz v. United States*," *In re John Doe Trader No. One*, 894 F.2d 240, 242 (7th Cir. 1990), and courts therefore apply the same legal framework to suppression motions under either source of authority. *See United States v. Larios*, 593 F.3d 82, 92 (1st Cir. 2010); *United States v. Clark*, 22 F.3d 799, 801 (8th Cir. 1994); *United States v. McKinnon*, 985 F.2d 525, 527 (11th Cir. 1993).

Our decision in this case turns on whether any expectation of privacy that the defendants may have harbored in their conversations within the police van was an objectively reasonable expectation. As we discuss below, we held in *Webster* that detainees lack an objectively reasonable expectation of privacy in conversations taking place in the back seat of a squad car, 775 F.3d at 903-04, but our decision held open the question of whether detainees might have a reasonable expectation of privacy in a different type of police vehicle, *id.* at 904. We address that question now, and answer it in the negative.

In the three-plus decades preceding the district court's suppression decision in this case, federal and state courts had concluded with apparent unanimity that a person has no objectively reasonable expectation of privacy while seated in a marked patrol car. *See United States v. Dunbar*, 553 F.3d 48, 57 (1st Cir. 2009); *United States v. Turner*, 209 F.3d 1198, 1200–01 (10th Cir. 2000); *Clark*, 22 F.3d at 801-02; *McKinnon*, 985 F.2d at 527–28; *United States v. Fridie*, 442 F. App'x 839, 841 (4th Cir. 2011) (per curiam) (non-precedential decision); *United States v. Carter*, 117 F.3d 1418 (table), 1997 WL 336290 (5th Cir. June 5, 1997) (per curiam) (unpublished); *United States v. Sallee*, No. 91 CR 20006-19, 1991 WL 352613, at *2 (N.D. Ill. Oct. 24, 1991) (collecting state cases); *State v. Torgrimson*, 637 N.W.2d 345, 350 (Minn. Ct. App. 2002); *State v. Ramirez*, 535 N.W.2d 847, 850 (S.D. 1995) (collecting cases); *State v. Smith*, 641 So.2d 849, 852 (Fla. 1994); *People v. Crowson*, 660 P.2d 389, 392-93 (Cal. 1983) (plurality), *overruled in part on other grounds by People v. Myers*, 858 P.2d 301 (Cal. 1993). Those holdings have deemed it immaterial whether the individual has been arrested, temporarily detained, or simply invited to sit in the car while the

police conduct an investigation. *See*, *e.g.*, *Turner*, 209 F.3d at 1201 ("whether an individual is in custody does not materially affect an expectation of privacy in a police car") (following *McKinnon*, 985 F.2d at 528 ("[w]e find no persuasive distinction between pre-arrest and post-arrest situations in this case") (collecting cases)).

A number of these decisions are, as Chief Judge Castillo pointed out in *Williams*, fairly cursory in their treatment of the issues. 15 F. Supp. 3d at 828. From the cases that address the subject in any detail, two basic points emerge. First, the patrol car is an official, crime-fighting vehicle that serves both as a police officer's workplace and also as a mobile jail. *Clark*, 22 F.3d at 801–02. Consequently, an individual seated in that car would have no reason to expect privacy within the car. *Id*. Second, the dashboard area of a patrol car, which is visible to anyone sitting in the car, "bristl[es]" with electronic equipment (including two-way radios, for example) that places one on notice of the possibility that his oral statements may be intercepted. *Turner*, 209 F.3d at 1201.

Prior to *Williams*, only a few cases had expressly dealt with police vehicles other than squad cars; and although they too had found no reasonable expectation of privacy for conversations occurring within such vehicles, they did not expressly address how the unique compartmentalization of the vehicle's interior might affect privacy expectations. *See United States v. Mahon*, No. CR 09-712-PHX-DGC, 2010 WL 3954506, at *4 (D. Az. Sep. 29, 2010) ("Defendants clearly had no legal expectation of privacy while handcuffed in the police van.") (citation omitted), *j. aff'd*, 620 F. App'x 571 (per curiam) (non-precedential decision) & 804 F.3d 946 (9th Cir. 2015), *cert.*

*denied*, 136 S. Ct. 2510 (2016); *United States v. Reese*, No. 1:09 CR 00145, 2010 WL 2606280, at *5 (N.D. Ohio June 25, 2010) (relying on squad car cases to hold that "none of the defendants could reasonably expect that their conversations were private merely because they were alone in the van, handcuffed and awaiting transport to the Cleveland Police Department for questioning"); *United States v. Ingram*, No. IP 04-201-CR-1 H/F, *et seq.*, 2005 WL 775930, at *1 n.1 (S.D. Ind. Mar. 25, 2005) (Hamilton, J.) (noting court's prior oral ruling that defendants lacked reasonable expectation of privacy within a police van used to transport them to jail), *appeal dismissed sub. nom. United States v. Douglas*, 182 F. App'x 558 (7th Cir. 2006) (per curiam) (unpublished).

In his *Williams* decision, Chief Judge Castillo acknowledged the general line of authority as to squad cars, but found the layout of a police squadrol to be materially distinct from that of a patrol car vis-à-vis the expectation of privacy. In contrast to a typical patrol car, a squadrol (which is used both as an ambulance and as a vehicle to transport detainees) has a separate cab for the driver and his passenger, resulting in a physical division of the driver's compartment from the fully enclosed rear section of the vehicle. 15 F. Supp. 3d at 829. Within their own compartment, the detainees are not within earshot of officers sitting in the cab. *Id.* Moreover, the rear compartment does not "bristle" with electronics that are visible to detainees. *Id.* Detainees in the rear compartment of a squadrol thus have practical reasons to expect privacy that detainees in the back seat of a patrol car lack. *Id.* And that is true even if the squadrol is regarded as a mobile jail. The judge could not imagine that the types of safety concerns that

outweigh individual privacy interests in the jail setting (controlling narcotics and other contraband, and preventing escape) are present to the same degree in a squadrol. *Id.* at 829–30. Indeed, if safety concerns were the motivation for the government's decision to intercept detainee conversations, then its agents would have activated the live-monitoring feature of their equipment. But they had not taken advantage of that feature, which led Judge Castillo to conclude that the government's real purpose in intercepting the detainee's conversations was to capture their incriminating statements. *Id.* at 830. Weighing the totality of the circumstances, he concluded that the detainees had a reasonable expectation of privacy in the rear compartment of the squadrol and that the government's wish to capture any incriminating remarks was not justified. *Id.*

The modified cargo van at issue in this case has a layout that is distinct from both the typical patrol car and the squadrol: it has three compartments separated by metal dividing walls with small (and thick) plexiglass viewing windows. But there is no dispute that in material respects, the van is more like the squadrol than the patrol car. Detainees are seated within a separate, fully enclosed compartment—in this case, with another empty compartment between them and the driver's compartment. The detainees' compartment did not "bristle" with visible electronic equipment. And, per Judge Gettleman's findings, the prisoners would have subjectively expected that if they were speaking quietly, they would not be overheard by the driver and his passenger. Judge Gettleman thus relied on *Williams* to conclude that the defendants had an objectively reasonable expectation of privacy in the conversa-

tions they conducted within the rear compartment of the van. *Paxton I*, 2014 WL 3807965, at *1.

It was not long after Chief Judge Castillo's decision in *Williams* and Judge Gettleman's first decision in *Paxton* that we held in *Webster* that an individual lacks an objectively reasonable expectation of privacy in conversations occurring within a squad car. 775 F.3d at 903–04. We found the decisions of our six sister circuits instructive on this point, noting, as they had, that squad cars function both as a mobile office for a patrol officer and as a temporary jail for detainees in transport. *Id.* at 904 (citing *Clark*, 22 F.3d at 801–02, and *McKinnon*, 985 F.2d at 537). At the same time, such vehicles visibly bristle with electronics that place a detainee on notice of the possibility that his statements might be recorded. *Id.* (citing *Turner*, 209 F.3d at 1201).

> Given the nature of the vehicle and the visible presence of electronics capable of transmitting any internal conversations, the expectation that a conversation within the vehicle is private is not an expectation that society would recognize to be reasonable. We agree with those circuits, and hold that conversations in a squad car such as the one in this case are not entitled to a reasonable expectation of privacy, and therefore the recording of the conversation [in this case] is not a violation of the Fourth Amendment.

*Id.* We added, however, "that this holding reflects the layout and equipment of the squad car, and express no opinion as to conversations that occur in other vehicles." *Id.* We cited and

distinguished *Williams*, noting the distinctive layout of a police squadrol that Chief Judge Castillo had relied upon to conclude that detainees did have a reasonable expectation of privacy in conversations occurring in that type of vehicle. *Id.* at 904.

This case requires us to confront the issue we left open in *Webster* and to decide whether the unique features of police vans and squadrols support an expectation of privacy that society is prepared to recognize as reasonable. Although we agree with Judges Castillo and Gettleman that distinctions can be drawn between a squad car on the one hand and a police squadrol or van on the other, we believe those distinctions matter more as to a detainee's subjective expectation of privacy than they do to the objective reasonableness of that expectation of privacy. The enclosed nature of the detainee compartment in a van like the one used to transport the defendants in this case may cause a detainee to think that he cannot be overheard. *See* R. 156-1 (declaration of Matthew Webster) ¶ 3 ("I believed that the conversation was private because it was in a separate, enclosed area of the paddy wagon and not in a squad car, and because we had the conversation when no agents or officers were present and the van door was shut … ."). But given the inescapable fact that a detainee has been taken into custody and placed into a marked police vehicle for transport to a law enforcement facility, we are not convinced that any expectation of privacy on the part of the detainee in the van is one that society is prepared to recognize as reasonable.

At the outset, we emphasize that the police van was functioning (and was designed to function) as a mobile jail cell. *See Clark*, 22 F.3d at 801–02; *McKinnon*, 985 F.2d at 527. The defendants had been arrested and placed in handcuffs, and

they were being transported in the van to the ATF field office for processing and questioning, and hence to incarceration. The arrest itself resulted in a diminished expectation of privacy on the part of the defendants, *see McKinnon*, 985 F.2d at 527, and as detainees they could not reasonably have perceived the (marked) police van as a sanctuary for private conversation, *Clark*, 22 F.3d at 802; *United States v. Colon*, 59 F. Supp. 3d 462, 466 (D. Conn. 2014). *See Hudson v. Palmer*, 468 U.S. 517, 525–28, 104 S. Ct. 3194, 3200–01 (1984) (prisoner has no reasonable expectation of privacy in prison cell), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662 (1986); *Lanza v. New York*, 370 U.S. 139, 143, 82 S. Ct. 1218, 1221 (1962) (in jail setting, "official surveillance has traditionally been the order of the day"); *United States v. Madoch*, 149 F.3d 596, 602 (7th Cir. 1998) (marital communications privilege does not apply vis-à-vis recorded telephone conversations between defendant and her incarcerated spouse, as privilege applies only to communications made in confidence, and there is no expectation of privacy in jail telephone calls).

The fact that the interior of the van was divided by walls into separate, fully enclosed compartments in no way altered the essential nature of the vehicle. The metal dividing walls, with their thick plexiglass windows, were present to serve a security function rather than to foster an atmosphere of solitude and privacy. The defendants' surroundings may have lulled them into assuming, mistakenly, that their discussions could not be overheard; but in that respect this case is no different from those in which individuals have been left alone in the back seat of a patrol car, thinking no one can overhear what they say. *See Clark*, 22 F.3d at 800-01; *McKinnon*, 985 F.2d

at 526. Regardless of the particular layout, a police vehicle that is readily identifiable by its markings as such, and which is being used to transport detainees in restraints, does not support an objectively reasonable expectation of conversational privacy.

The rear compartment of the van was not "bristling" with electronics, it is true. *Cf. Turner*, 209 F.3d at 1201. But even when police radios, scanners, computer terminals and other equipment are visible to a detainee, it is unlikely that any of those items are actually the source of electronic surveillance; the recording devices themselves, if present, are likely to be nearly if not wholly invisible to the untrained eye. *See Colon*, 59 F. Supp. 3d at 466–67. Such electronic equipment that is visible to a detainee may cause him to think about the prospect of covert surveillance. But given the increasing presence of unobtrusive, if not invisible, audio and video surveillance in all manner of places, public and private,[1] one wonders how much of a reminder a detainee needs that he might be under surveillance—particularly in a marked police vehicle—or that this might be so regardless of whether he can see any obvious signs of surveillance devices.

More to the point is the likelihood that we are fast approaching a day when police interactions with civilians, including detainees, will be recorded from beginning to end,

---

[1] *See, e.g.*, David Alan Sklansky, *Too Much Information: How Not to Think About Privacy and the Fourth Amendment*, 102 Cal. L. Rev. 1069, 1085–87 (2014) (discussing extent of electronic surveillance that individuals face in various settings); Kevin Werbach, *Sensors and Sensibilities*, 28 Cardozo L. Rev. 2321, 2323–38 (2007) (same).

and for a variety of important ends. Police surveillance equipment (including both dashboard cameras and body cameras) has become both cheaper and more effective at a time when the public interest in police conduct, by virtue of certain abuses exposed by citizen cell-phone cameras in addition to police surveillance equipment, has skyrocketed. *See, e.g.*, Iesha S. Nunes, Note, *"Hands Up, Don't Shoot": Police Misconduct and the Need for Body Cameras*, 67 Fla. L. Rev. 1811 (2015).[2] Government, members of the public, and detainees share an interest in monitoring the handling of detainees in order to ensure that they are being treated appropriately. *Cf. Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 605–07 (7th Cir. 2012) (finding no privacy interest supporting use of state eavesdropping statute to criminalize third-party audiovisual recording of police officers performing their duties—including engaging citizens in non-confidential conversations—in public places). Police officers and other law enforcement agents have a parallel interest in both the appropriate treatment of detainees (to foster public confidence in law enforcement and to rebut false allegations of misconduct) and identifying problem officers and practices where they exist. Officers also have a significant interest in security that warrants the monitoring of detainees in their custody, to ensure that detainees are not harming one another or attempting escape, or that a detainee

---

[2]   Events of the last several years in particular may have focused the public's attention on police practices resulting in injuries to detainees and other civilians, but the public interest in such police actions substantially predated the events at issue in this case. *See* Nunes, "Hands Up, Don't Shoot," 67 Fla. L. Rev. at 1815-19 (summarizing incidents over past 25 years).

has not fallen ill, for example. *See, e.g.*, *Virginia v. Moore*, 553 U.S. 164, 177, 128 S. Ct. 1598, 1607–08 (2008) (describing safety rationale for permitting police searches incident to arrest); *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 330–34, 132 S. Ct. 1510, 1518-20 (2012) (noting safety and health interests that justify intrusive searches of detainees upon admission to jail).[3] The government stresses this latter interest in its briefs. We agree with the defendants that it is somewhat ironic for the government to invoke this interest, given that it did not use its surveillance equipment to monitor them in real time during their transport to the ATF office (which would have enabled agents to detect and address any safety problems as they arose) and instead only recorded their conversations for later use. But the material point, in terms of the defendants' expectation of privacy, is that the government has legitimate reasons, wholly consistent with the public interest, for monitoring individuals it has taken into its custody and placed into a transport vehicle. Regardless of the agents' actual motivations for monitoring the defendants during transport, these legitimate interests reinforce our conclusion that society is not prepared to recognize as reason-

---

[3] The *Williams* decision posits that the safety concerns of officers transporting detainees are not comparable to those warranting intrusion upon an inmate's privacy in the prison setting. 15 F. Supp. 3d at 829–30. Certainly there are differences between the two settings, but we think that the interests warranting close monitoring of detainees are no less compelling in the transportation context than they are in the jail or prison setting. Two officers transporting multiple detainees on public roads must deal with multiple risks and multiple demands on their attention, rendering both themselves and detainees more vulnerable to harm than they would be in a secure location with multiple staff members to assist them.

able whatever subjective expectations of privacy the defendants may have harbored in their conversations within the van. *See Illinois v. Lafayette*, 462 U.S. 640, 646–47, 103 S. Ct. 2605, 2609–10 (1983) (conducting inventory search of arrested person's belongings is reasonable regardless of particular officer's subjective motivations for search).

In sum, because the defendants lacked an objectively reasonable expectation of privacy when placed into the marked police van, the interception and recording of their conversations did not constitute a search for purposes of their Fourth Amendment rights or an unauthorized interception for purposes of Title III. Our conclusion on this score makes it unnecessary for us to reach the question of whether and when the defendants' subjective expectation of privacy within the van terminated, and renders Webster's cross-appeal moot.

One point remains for us to address for the sake of completeness, and that is whether there was any problem posed by the identification questions that agents asked of the defendants as they entered the van, the answers to which were later used to identify the speakers in the recorded conversations that took place within. Because these questions were posed by agents before the defendants were left alone in the rear compartment of the van, the defendants cannot have had any reasonable privacy expectation in their answers. *See Katz*, 389 U.S. at 361, 88 S. Ct. at 516 (Harlan, J., concurring) (statements that individual "exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited"). Nor did they have any cognizable privacy interest in their voices. *United States v. Dionisio*, 410 U.S. 1, 14–15, 93 S. Ct. 764, 771–72 (1973); *United States v. Ceballos*, 385

F.3d 1120, 1123 (7th Cir. 2004). Although the defendants had not yet been given their *Miranda* warnings when they were asked these biographical questions, we do not think there was any Fifth Amendment violation, given that the sorts of questions posed (soliciting, *e.g.,* their names, birth dates and/or ages, and places of residence)—the same sorts of questions that would be posed in booking any arrested individual—are not the sort of questions that one would expect to yield incriminating information. *See United States v. Edwards*, 885 F.2d 377, 385–86 (7th Cir. 1989); *see also United States v. Westbrook*, 125 F.3d 996, 1003 (7th Cir. 1997); *United States v. Kane*, 726 F.2d 344, 349 (7th Cir. 1984).

### III.

Having concluded that the defendants lacked an objectively reasonable expectation of privacy within the police van, we REVERSE the district court's decision to partially suppress the covertly recorded statements that the defendants made while conversing in the van. We DISMISS defendant Webster's cross-appeal as moot.