2021 IL App (1st) 190622-U

No. 1-19-0622

Order filed November 10, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14CR00573 |
| | ) | |
| ANTONIO SHORT, | ) | Honorable |
| | ) | Michele M. Pitman, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice McBride concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the judgment of the circuit court over defendant's contention that his trial counsel was ineffective in failing to move to suppress a video recording of defendant on the grounds that the recording violated his Fourth Amendment rights. We also reject defendant's argument in the alternative that we should remand this case for an evidentiary hearing for the court to consider evidence of defendant's youth and its attendant characteristics where defendant was 22 years old at the time of the offense.

¶ 2   Following a jury trial, defendant Antonio Short was found guilty of the first degree murder

of Darius Wilkerson (Darius) and personally discharging a firearm that caused death. The trial

court subsequently sentenced defendant to 50 years' imprisonment. At defendant's trial, the State introduced a video recording of defendant talking on a cellphone in an interrogation room in a police station in Indiana after defendant was arrested pursuant to an arrest warrant. Defendant objected to the admission of the video arguing, *inter alia*, that defendant was recorded in violation of Indiana law. The court initially precluded the State from introducing the video, but subsequently granted the State's motion to reconsider and permitted the State to show the video recording to the jury.

¶ 3    On appeal, defendant contends that his trial counsel was ineffective in failing to move to suppress the video recording of defendant on the grounds that the recording was performed in violation of the Fourth Amendment. Defendant acknowledges that his trial counsel did contest the admissibility of the recording, but did so on the basis of a violation of Indiana law, rather than the Fourth Amendment. Defendant asserts that a motion to suppress on the basis of a Fourth Amendment violation would have been granted and likely would have changed the outcome of the trial. Defendant also asserts that, in the alternative, we should remand this matter for an evidentiary hearing for the trial court to determine whether the mandatory minimum sentence of 45 years in this matter is unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012), where defendant was 22 years old at the time of the offense.

¶ 4                                    I. BACKGROUND

¶ 5                                  A. Motion to Suppress

¶ 6    Prior to trial, defendant filed a motion *in limine* to bar the admission of Darius' hearsay testimony. In the motion, defendant alleged that officers who responded to the shooting spoke to Darius before he died. Darius purportedly told the officers: "please save me, don't let me die up here" and, in response to the officers' questions about who shot him, Darius responded, "Antonio

- 2 -

over on Wallace." Defendant asserted that these statements by Darius were inadmissible hearsay and did not meet any exceptions to the rule against hearsay because there was no evidence that Darius believed his death was imminent at the time he made the statements or that his statements were made from stress or excitement.

¶ 7　The court held a hearing on the motion where the State presented the testimony of the paramedic who rendered aid to Darius on the scene and a detective who arrived on the scene and spoke to Darius before he was taken in the ambulance to the hospital. The court denied the motion *in limine* finding that the evidence showed that Darius knew death was imminent when he made the statements because Darius was asking people to save him and stated that he thought he was going to die. The court therefore found the statements were admissible as a dying declaration. The court also found that the statements could be admitted under the excited utterance exception to the hearsay rule because Darius had been shot, which was a startling event, and because Darius did not have time or reason to fabricate the statements.

¶ 8　　　　　　　　　　　　B. Trial Evidence

¶ 9　The record shows that on November 30, 2013, Darius' brother, Duwan Wilkerson (Duwan), Bernard Jackson, Wesley Addison, Darius, and defendant were playing a game of dice in a second floor bedroom of a "trap house" in Riverdale, Illinois. Duwan testified that during the game, defendant and Darius started "feuding" because defendant said that Darius owed him $2. Darius had money in his hand, but did not give defendant the $2. The two then "exchanged words," but did not get into a physical altercation. Defendant left, but the others kept shooting dice.

¶ 10　As the game continued, Darius and Jackson started "tussling." They were "play shoving" and the altercation did not appear to be serious. Darius and Jackson continued tussling out into the hallway. Duwan stayed in the bedroom, but he saw defendant walk up the stairs to the second floor

hallway. Duwan then heard a gunshot. He saw defendant with a gun in his hand pointed toward where Duwan had last seen Darius, who had moved from the hallway into another bedroom. Defendant was holding a "38 revolver with no hammer to it. It was a snub nose." Addison pushed the bedroom door closed, but Duwan could still hear voices coming from the hallway. Defendant told Darius to give him his money, and Darius asked defendant if he was going to shoot him over $2. Defendant responded that Darius owed him more than $2. Duwan noted that defendant sounded angry and kept shouting about Darius owing him money.

¶ 11    Duwan opened the door to the bedroom and saw defendant running down the stairs wiping down the gun with the sleeves of his sweater. Duwan went to the other bedroom where he saw Darius lying on the floor. Duwan saw a bullet wound in Darius' stomach. Duwan called 9-1-1 and waited for paramedics to arrive with Zake Colone-Wells (Zake) who was on the first floor of the trap house. When the police officers arrived on the scene, they arrested Duwan and Zake and took them to the police station for interviews. At that time, Duwan did not tell police that defendant shot Darius. Duwan was subsequently released and learned from his father that Darius had died. Duwan returned to the police station the next day and gave a statement to the officers and an assistant State's Attorney (ASA). Duwan told the police and the ASA that defendant shot Darius.

¶ 12    Jackson, who acknowledged that he had a pending case for failing to appear as a witness in this case, testified that he could not recall whether defendant was at the "trap house" on the night Darius was shot. He acknowledged that he gave a handwritten statement to police and an ASA, but testified that he was "very intoxicated" at the time he gave the statement and did not remember what he told them. Jackson also testified that he never identified a picture of defendant in a photograph array as the shooter.

¶ 13    The State confronted Jackson with a typewritten statement he gave to police and an ASA on December 2, 2013. The State later published the statement to the jury through the ASA who took the statement. In the statement, Jackson said that on November 30, 2013, he was at "the crib" playing dice with Darius, Duwan, Addison, and defendant. Defendant accused Darius of owing him $2 and then defendant left. The others continued playing dice and then Darius and Jackson started "tussling" because Darius owed Jackson money from the dice game. As they were tussling, Jackson heard a gunshot. Darius and Jackson pulled away from each other and Jackson saw defendant in the hallway. Defendant was standing over Darius with his arm pointed toward him and holding something in his hand. Jackson could not see what defendant was holding. Defendant then ran down the stairs and out of the house. Jackson ran outside and saw defendant running away from the house. Jackson returned inside and saw Darius lying on the floor. Darius looked like he had been shot.

¶ 14    Addison likewise initially denied seeing defendant shoot Darius that night. He acknowledged, however, that he gave a videotaped statement to police on December 1, 2013. Addison's videotaped statement related largely the same information as Duwan's testimony and Jackson's statement concerning the game of dice, defendant's argument with Darius over $2, Jackson play "tussling" with Darius, and defendant eventually returning to the trap house and shooting Darius in the stomach. Addison stated that he saw defendant's face as he came up the stairs and saw that he was holding a gun. Like Duwan and Jackson, Addison related that defendant yelled at Darius "you think you're going to play me out of $2 and you already owe me $30." After defendant left, Addison and Duwan stayed by Darius until police arrived. Addison also acknowledged that he identified defendant as the shooter in a photograph array at the police station.

On cross-examination, however, Addison testified that he did not know who shot Darius and his signature on a picture of defendant identifying him as the shooter was not true.

¶ 15    Zake, who acknowledged that he was testifying under a subpoena, testified that he was on the first floor of the trap house on November 30, 2013, when Darius was shot. Zake testified he was hanging out with friends, drinking alcohol and taking ecstasy pills. Zake could hear the others upstairs playing dice, but he did not participate. Zake testified that he saw multiple people going up and down the stairs of the house that night, including defendant. Zake saw defendant leave the house and then return going back up the stairs. After defendant returned, Zake heard a single gunshot. Zake ran out of the house and then came back in and went upstairs. There, he saw Duwan and Darius. Duwan and Zake removed Darius' sweatshirt and saw that he had been shot in his stomach. Zake acknowledged that on December 2, 2013, he agreed to give a videotaped statement to an ASA at the Riverdale Police Department.

¶ 16    In the videotaped statement, Zake told the ASA that after defendant left the house, he was gone for 15 to 20 minutes. When defendant came back into the house, Zake noted that defendant pulled his hand into the sleeve of his sweatshirt and used his sleeve to wipe his fingerprints off of the door. Zake also saw defendant holding a ".38 snub nose wood grip handle, Blue Steel" revolver. Zake watched defendant, who had a "smirk" on his face, go up the stairs. Immediately after defendant went up the stairs, Zake heard defendant say: "You thought I forgot about the $30 you b**** a** n*****." Zake then heard a gunshot. Zake could tell that defendant was yelling at Darius because he could hear Darius responding to defendant. After defendant left the house, Zake and Duwan stayed with Darius until police arrived. Zake acknowledged that he first told the police that he did not know what happened that day and did not want to be involved. He testified that he later agreed to tell police the truth because he felt bad about what had happened.

¶ 17   Darius Hayes, who was on electronic monitoring for previously failing to appear as a witness in this case, testified that on November 30, 2013, he or his brother received a phone call from defendant. Defendant came to his house and Hayes let him inside. Hayes testified that he did not remember anything about their encounter that day, but he acknowledged that he gave a handwritten statement to police and an ASA at the Riverdale police department on December 3, 2013. He also testified that he appeared before a grand jury on December 6, 2013. When the State confronted Hayes with his typewritten statement and his grand jury testimony, Hayes acknowledged that the information he gave therein was correct.

¶ 18   In his statement and in his grand jury testimony, Hayes acknowledged that he received a phone call from defendant on November 31, 2013. When defendant arrived at Hayes' apartment building, Hayes noted that defendant was out of breath. Hayes had a conversation with defendant where defendant told him that he "had to pop" Darius. Hayes understood this statement to mean that defendant had shot Darius with a gun. Defendant told Hayes that Darius had been trying to cheat him out of some money at a dice game. Darius already owed defendant money because he had never paid back some borrowed money. Defendant told Hayes that he had to use the bathroom, so he went upstairs to Hayes' apartment. After a few minutes, Hayes went upstairs to check on defendant because he had not returned. When Hayes entered his apartment, he observed defendant leaving Hayes' bedroom. Hayes stated that there was no bathroom in his bedroom. Hayes did not confront defendant about being in his bedroom because defendant "just committed a murder."

¶ 19   After Hayes and defendant returned downstairs, defendant told Hayes additional information about the shooting. Defendant told Hayes that after arguing with Darius, defendant left the trap house to get his gun. When defendant returned, he saw Darius wrestling with Jackson. Defendant shot Darius and then left. After telling Hayes about the shooting, defendant called for a

ride to pick him up. After defendant left, Hayes went into his bedroom where he had seen defendant earlier. Hayes saw defendant's state identification card sticking out of a textbook. Hayes then retrieved a tennis shoe from underneath his bed and noted that it was heavy. Hayes inspected the shoe and discovered that there was a hat stuffed inside the shoe and inside the hat was a gun. Hayes had never seen the gun before. Hayes did not know what to do with the gun, so he put the hat with the gun back inside of his shoe and slid it under his bed. Hayes knew that neither the hat nor the gun were under his bed inside the shoe before defendant entered his room. Detectives from the Riverdale police department later recovered the gun and defendant's identification card.

¶ 20 Riverdale police detective Ivan Lugo responded to the shooting. When he arrived, he observed Darius lying on the ground in "extreme pain." Darius was in and out of consciousness and told the officers to not let him die. Detective Lugo asked Darius who shot him and Darius responded: "Antonio from Wallace." Zake told the ASA that defendant lived on "Wallace." Hayes testified that in 2013, defendant lived on "Wallace." The State also introduced the testimony of an employee of a "government agency," whose responsibilities included meeting with clients and verifying their personal information.[1] The employee testified that in 2013, defendant lived on South Wallace Avenue.

¶ 21 Riverdale police Sergeant Plumey[2] testified regarding his interview of Addison on December 1, 2013. He testified that Addison told him the same information about the shooting that Addison related in his videotaped interview. Addison told Detective Plumey that he was

---

[1]Outside the presence of the jury, it was indicated that the government employee was defendant's probation officer.

[2]Sergeant Plumey's first name is not included in the record filed on appeal.

"positive" defendant was the shooter. Addison also identified defendant as the shooter in a photograph array and labeled the picture of defendant "shooter."

¶ 22    The paramedic who responded to the shooting testified that when he arrived on the scene, Darius was on lying on the floor, anxious, and in distress. The paramedic observed that Darius had a "penetrating hole in his abdomen." The paramedic testified that Darius was alert, and told the paramedics that he could not breathe and "felt as if he was dying." The parties stipulated that, if called to testify, the medical examiner who performed Darius' autopsy would testify that Darius died of a gunshot wound to the abdomen.

¶ 23    Defendant was arrested on December 5, 2013, by the U.S. Marshall's Task Force in South Bend, Indiana. Defendant was then turned over to the St. Joseph County Police Department in Indiana. St. Joseph County police detective Alex Arendt testified that in 2013 he worked for the St. Joseph Metro Homicide Unit (Homicide Unit). The Homicide Unit was stationed in a building with four interview rooms. Each of the rooms was outfitted with audio and video recording equipment. The recordings were activated from a main hub in the commander's office. Detective Arendt testified that at the request of the Illinois police on December 5, 2013, he downloaded to a DVD an audio and video recording of defendant that was taken while defendant was in one of the interrogation rooms at the Homicide Unit. The State then played a clip from the recording for the jury.

¶ 24    In the recoding, defendant is sitting near a desk talking on a cellphone. Defendant says he is going to need the "best lawyer" because it "ain't what they know, it's what they can prove." Defendant then asks the person on the phone who is "talking." Defendant responds to the person on the phone by saying, "he wasn't even around" and asking, "who is cooperating with the police?" Defendant then asks a person on the phone, "they got the gun?" and "they saying my fingerprints

was on it?" Defendant again asks who is cooperating with the police, stating that he is only concerned with people who were at the "house." The person on the other end of the phone audibly asked, "Ain't nobody in the room with you?"[3] and defendant responded that he would not be talking the way that he was if there were somebody in the room. Defendant then asked how someone is "charged with accessory" because that person was not "there." Defendant said he will not say anything to incriminate himself. Defendant stated that he needed to know what was happening because he was going to be "locked up." Defendant then stated, "several witnesses. All of them gotta come to court and everything." At that point, an officer comes into the room and tells defendant to "wrap it up." Defendant asks for five more minutes, but the officer says that he already given defendant "seven." Defendant then hangs up the cellphone and hands it to the officer. The officer takes the phone and leaves the room.

¶ 25    Following closing argument, the jury found defendant guilty of first degree murder. At the subsequent sentencing hearing, following arguments in aggravation and mitigation, the court sentenced defendant to 50 years' imprisonment, 25 years for first degree murder, and 25 years for personally discharging a firearm that caused death. Defendant now appeals.

¶ 26                                    II. ANALYSIS

¶ 27    On appeal, defendant contends that his trial counsel was ineffective in failing to move to suppress the recording of defendant from the interrogation room in Indiana on the grounds that the recording was performed in violation of the Fourth Amendment. Defendant asserts that trial

---

[3]Before introducing the recording, the parties discussed with the court outside the presence of the jury whether the recording was admissible because, *inter alia*, in certain portions of the recording, the audio from the people on the other end of the phone call was audible. The ASA represented that those portions are only intelligible if the recording is listened to with headphones. The jury watched the video in open court without headphones. Thus, it is unclear whether the jury was able to hear what the people on the end of the phone asked defendant.

counsel primarily challenged the admissibility of the recording on the basis of an Indiana statute, but should have challenged the admission of the recording in a motion to suppress on the basis that defendant had a reasonable expectation of privacy in the interrogation room. Defendant asserts that this motion would have been successful and likely changed the result of the trial. In the alternative, defendant contends that we should remand this matter for an evidentiary hearing for the trial court to determine whether the mandatory minimum 45-year sentence in this case is unconstitutional as applied to defendant where defendant was 22 years old at the time of the offense.

¶ 28                          A. Interrogation Room Recording

¶ 29    We will first address defendant's contention that his trial counsel was ineffective in failing to move to suppress the recording on the basis that it was conducted in violation of the Fourth Amendment. As noted, defense counsel did challenge the admissibility of the recording at trial, but did so under the theory that the recording violated Indiana law. Defendant asserts that this was an insufficient basis on which to challenge the admission of the recording. Defendant contends that a Fourth Amendment challenge to the recording would have succeeded because the officers left defendant alone in the room, provided defendant with a cellphone to make the phone call, were not interrogating defendant at the time, and did not inform defendant that he was being recorded. Defendant asserts that, under these circumstances, he had a reasonable expectation of privacy, which was violated when the police surreptitiously recorded his phone call.

¶ 30          1. *Defense Counsel's Objection to the Admission of the Recording*

¶ 31    Prior to Detective Arendt's testimony, defense counsel informed the court that he had an objection to Detective Arendt's proposed testimony. Outside the presence of the jury, the ASA informed the court that it was planning to introduce a video recording of defendant talking on a

cellphone in the interrogation room at the St. Joseph County Police Department in Indiana. The ASA generally informed the court about the contents of the video, including that defendant can be heard speaking to someone on the cellphone about witnesses.

¶ 32    Defense counsel objected to the admission of the video arguing that defendant was never informed that he was being recorded. Defense counsel argued that this was a "material misrepresentation" of whether or not defendant was being recorded and not mere subterfuge. Defense counsel also noted that Indiana was a one-party consent state and neither defendant nor the people on the other side of the phone conversation consented to being recorded. Defense counsel also pointed out that the people on the other side of the phone call can be heard on the recording. Defense counsel asserted that was "clearly hearsay." Defense counsel asserted that one of the detectives gave defendant a cellphone to use in an attempt to induce him into making a phone call so that the officers could record it. Defense counsel contended that this was an "eavesdropping issue." The State asserted that defendant was using his own cellphone to make the phone call and it was not an eavesdropping issue because defendant was in custody and the police were required to record him.

¶ 33    The court told the parties that this issue should have been raised prior to trial so that the court could fully consider the relevant law. The court asked that Detective Arendt testify regarding the recording outside the presence of the jury. Detective Arendt testified that Indiana law required police to record felony interviews. He noted, however, that there are no signs posted in the Homicide Unit where defendant was held informing people that they will be recorded. Detective Arendt explained that the recording system is activated by a switch in the commander's office. Detective Arendt testified that in 2013, individuals who were in custody were permitted to have personal cellphones, but were not provided with phones and there were no phones available in the

interrogation rooms. Detective Arendt explained the recording system in the room consisted of a "camera dome that is mounted on the wall directly in front of where [defendant] would have been seated." The microphone in the room consisted of a "light switch looking device on the wall."

¶ 34    Detective Arendt testified that he was "[m]ost likely" the person who activated the recording. Detective Arendt acknowledged that his unit was not investigating defendant at the time, but were merely holding him until the detectives from Illinois arrived to take defendant into custody. He noted, however, that defendant was arrested on an arrest warrant. Detective Arendt had no intention of interviewing defendant, but he knew the Illinois detectives were going to interview defendant. Detective Arendt's commander asked him to turn on the recording when the Illinois detectives arrived at the Homicide Unit. Detective Arendt acknowledged that defendant was on the phone when the recording device was first activated.

¶ 35    Following Detective Arendt's testimony, the court sustained defense counsel's objection finding that the recording was inadmissible evidence. The court found that "[t]he detectives appear to have turned the video on when the defendant is on the phone. He did not consent to be videotaped. I do not find that this is appropriate evidence."

¶ 36    The State subsequently filed a motion to reconsider that ruling contending that the Indiana interception statute would not apply because the officers did not intercept any communication, but instead the Federal Wiretapping Act (18 U.S.C. § 2510, et seq. (West 2014)) (Wiretapping Act) would apply. The State asserted that under the Wiretapping Act, the issue was "whether or not defendant had an expectation of privacy in the interview room of the St. Joseph County Metro Police Station." The State contended that defendant did not have an expectation of privacy because he was in custody on an arrest warrant for murder, the U.S. Marshalls informed him that he was in

custody on an arrest warrant, he knew he was not free to leave, and defendant was informed that officers from the agency that issued the arrest warrant were coming to retrieve him.

¶ 37 The State also asserted that defendant could not have a reasonable expectation of privacy based on his surroundings. Defendant was placed in an interview room at the Homicide Unit. The interview room was equipped with a video surveillance system which consisted of a "bubble" that housed a camera. The camera was located directly across from where defendant was sitting. The State noted that no one informed defendant that he would not be recorded. The State asserted that there was no evidence the police used subterfuge to obtain the video recording, and, in fact, the evidence suggested that defendant requested to use the telephone. The State contended that defendant therefore consented to be recording by asking to use the telephone to make a phone call in a location where he knew he would be recorded.

¶ 38 In response, defense counsel contended that the Indiana police violated Indiana law to obtain the recording. Defense counsel asserted that the Indiana statute prohibited eavesdropping because it prohibited the interception or intentional recording of electronic communication. Defense counsel contended that the police needed express consent from defendant for the recording.

¶ 39 In response to the State's contentions, defense counsel stated that: "We're not counting this as a 4th Amendment argument." Defense counsel noted that there was a warrant for defendant's arrest, and "[w]e're not challenging it on 4th Amendment grounds." Instead, defense counsel asserted that the Indiana officers violated Indiana law "when they set up a situation where they give him a cell phone, they turn the camera on, they allow him to make a phone call, they capture the conversation on—"

¶ 40    At that point, the court interrupted defense counsel and inquired on what basis defense counsel sought to suppress the recording. The court noted that defense counsel did not file a motion and appeared to be asking "an Illinois court to suppress evidence based on a violation of Indiana law against your client[.]" Defense counsel responded that the officers' actions also violated Illinois law. Defense counsel contended that because the evidence was illegally obtained, "the 4th Amendment would apply, Judge, but it's not the ones that are germane usually to these types of proceedings. Not that they didn't have probable cause to arrest or they did some sort of other 4th Amendment violation. But the fact that they broke the law to obtain information so it would bring the 4th Amendment into play."

¶ 41    In ruling on the State's motion to reconsider, the court found that the police did not "intercept[]" defendant's phone call as that term was defined in the Indiana statute. The court noted that defendant was talking voluntarily on a cellphone that was provided to him to make the phone call. The court continued that "looking at this from a 4th Amendment purpose, does the defendant have a reasonable expectation of privacy? He was locked up. He is being detained. It is similar to being in the back of a squad car where the defendant knows he is not free to go and he is recorded." The court found that defendant did not have a reasonable expectation of privacy when he was in custody in Indiana. "He knows that at that point he could or likely could be recorded while he is in custody." The court therefore granted the State's motion to reconsider and permitted the State to play the recording for the jury.

¶ 42    After the State played the video for the jury, the State rested. Defense counsel moved for a mistrial based on the publishing of the video. Defense counsel asserted "that was clearly an eavesdropped conversation that my client had in violation of Indiana law. They did eavesdrop on a conversation without consent, without prior notice, and without it being in the ordinary conduct

of business." the court denied the motion, again finding that this was not an "interception" and that the defendant did not have "a reasonable expectation of privacy while he's in custody at the facility that he was being detained at."

¶ 43 Prior to the jury instruction conference, defense counsel renewed his motion for a mistrial arguing that the video recording of defendant was obtained in violation of the Illinois Eavesdropping statute. See 720 ILCS 5/14-2 (West 2016). Defense counsel asserted that although defendant placed the phone call in Indiana, he was calling people located in Illinois, so both parties had to consent to the call being recorded. The court asked defense counsel to clarify his argument as to whether he was making a Fourth Amendment argument. The court noted that "[t]he only way this evidence would get suppressed is if you're indicating that the defendant's constitutional rights were violated." Defense counsel responded: "I am not making a Fourth Amendment violation [*sic*]. I am stating that the police officers operating under the code of law illegally obtained a private conversation of my client."

¶ 44 In response, the ASA argued that defense counsel's argument was a "Fourth Amendment argument" because the issue was whether defendant had a reasonable expectation of privacy. The court denied the motion, agreeing with the State that the evidence was not illegally obtained and that "defendant was detained at the time and he did not *** have a reasonable expectation of privacy." The court continued that it was "conducting this analysis under a Fourth Amendment analysis." The court noted that there was a camera in the room, defendant was detained, and defendant was able to see that he was being recorded.

¶ 45 Defense counsel raised the issue again in his motion for a new trial, again arguing, *inter alia*, that the recording was obtained in violation of Indiana law. In response to the State's argument that the issue should be analyzed under the Fourth Amendment, defense counsel asserted

that defendant was alone in the room, he was not warned that he was being recorded, there were no signs posted in the building informing people that phone calls were recorded or monitored, and defendant told one of the people he was talking to on the phone that he would not be talking the way that he was if he was not alone in the room. Defense counsel contended that defendant therefore had a reasonable expectation of privacy.

¶ 46    The court denied the motion for a new trial again finding that the recording was not an "interception." The court also found that the issue raised by defense counsel was a Fourth Amendment issue and that defendant did not have a reasonable expectation of privacy. The court found that the recording did not violate Indiana or federal law. The court observed that there were cameras "everywhere" in the building, including in the interrogation room where defendant made the phone call. The court found that it was not reasonable for defendant to think, as an arrestee, that he would have the expectation of privacy.

¶ 47                                    2. *Ineffective Assistance*

¶ 48    To prove a claim for ineffective assistance of counsel, a defendant must show that his counsel's performance was objectively unreasonable and that defendant was prejudiced by that performance. *People v. Patterson*, 2014 IL 115102, ¶ 81. Where a defendant raises a claim of ineffective assistance on the basis of an unargued suppression motion, defendant must prove two separate propositions to establish prejudice. First, defendant must show that the proposed motion to suppress would have been granted and the evidence would have been suppressed. *People v. Henderson*, 2013 IL 114040, ¶ 15. Second, defendant must show that, if the evidence had been suppressed, there is a "reasonable probability" that the outcome of his trial would have been different. *Id.*

¶ 49                            i. Trial Counsel's Performance

¶ 50    Defendant contends that his trial counsel's performance was deficient because counsel challenged the admissibility of the recording on the basis of Indiana law rather than on Fourth Amendment grounds. Defendant asserts that defense counsel should have known that a challenge to the recording based on the Indiana statutes regulating the interception of electronic communications would have been unsuccessful because the recording in this case was not one contemplated by the terms of the statutes. See Ind. Code § 35-33.5-5-3; § 35-31.5-2-176; § 35-31.5-2-110. Defendant contends that these statutes are related to wiretaps, not eavesdropping as occurred in this case, and defense counsel was ineffective in challenging the admissibility of the recording on these grounds, rather than moving to suppress the recording on Fourth Amendment grounds.

¶ 51    As an initial matter, we recognize that trial counsel's decision on "whether to file a motion to suppress is generally considered a matter of trial strategy, which is entitled to great deference." (Internal quotation marks omitted.) *People v. Bew*, 228 Ill. 2d 122, 128 (2008). In this case, as defendant notes, trial counsel did not file a motion to suppress the introduction of the recording. Nonetheless, defense counsel vehemently opposed the admission of the recording, raising the issue before the trial court on four separate occasions and defending against the State's motion to reconsider the court's initial exclusion of the recording. Defense counsel argued that defendant was not aware he was being recorded, that the officers gave defendant the cellphone under subterfuge to induce him into making a phone call that they could record, that the other side of the conversation that could be heard on the recording was inadmissible hearsay, and that the recording violated Indiana, Illinois, and federal law. Ultimately, trial counsel was unsuccessful in excluding the video. This court has recognized, however, that "in all ineffective assistance of counsel claims, the defense strategies presumed sound did not work. The strategies must be shown to be more than

unsuccessful to overcome a presumption of soundness." (Internal quotation marks omitted.) *People v. Massey*, 2019 IL App (1st) 162407, ¶ 31 (quoting *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997)). "Trial strategies are unsound only when no reasonably effective criminal defense attorney, facing similar circumstances, would pursue such strategies." *Faulkner*, 292 Ill. App. 3d at 394.

¶ 52     In this case, the record is clear that defense counsel's strategy to exclude the recording did not work; however, defendant has failed to overcome the presumption of soundness. The fact that trial counsel was initially successful in objecting to the admission of the recording demonstrates that his strategy was not patently unsound. Although, after the further consideration, the court ultimately allowed the State to introduce the recording, this does not, in hindsight, establish that trial counsel provided ineffective assistance. *People v. Trotter*, 299 Ill. App. 3d 535, 539 (1998) ("Neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have proceeded differently is sufficient to establish ineffective assistance of counsel.").

¶ 53     In addition, the record shows that trial counsel did challenge the admission of the recording on Fourth Amendment grounds as defendant now contends counsel should have done. In opposing the State's motion to reconsider, defense counsel stated that "the 4th Amendment *would apply*, Judge, but it's not the ones that are germane usually to these types of proceedings. Not that they didn't have probable cause to arrest or they did some sort of other 4th Amendment violation. But the fact that they broke the law to obtain information so it would bring the 4th Amendment *into play*." (Emphases added.) Further, in arguing the motion for a new trial based on the improper admission of the recording, defense counsel asserted that defendant was alone in the room, he was not warned that he was being recorded, there were no signs posted in the building informing people that phone calls were recorded or monitored, and defendant told one of the people he was talking

to on the phone that he would not be talking the way that he was if he was not alone in the room. Defense counsel contended that defendant therefore had a reasonable expectation of privacy. These are the same contentions defendant now asserts that defense counsel should have raised in a motion to suppress the recording on Fourth Amendment grounds. Thus, defense counsel did raise arguments on Fourth Amendment grounds, but the trial court ultimately rejected those arguments. Accordingly, defendant has failed to demonstrate that his trial counsel's performance was deficient.

¶ 54                                    ii. Merit of Proposed Suppression Motion

¶ 55     Nonetheless, even if we were to find that defendant had established this his trial counsel's performance was deficient, defendant has failed to establish prejudice by demonstrating that the proposed suppression motion would have been granted. Defendant contends that instead of challenging the admission of the recording on the basis of Indiana law, defense counsel should have raised the issue in a motion to suppress on Fourth Amendment grounds. Defendant contends that such a motion would have been successful because the totality of the circumstances suggested that defendant had a reasonable expectation of privacy. Defendant points out that the police officers left defendant alone in the room, permitted him to make a phone call on a cellphone, did not inform him that he was being recorded, and did not obtain consent to record him. Defendant maintains that these circumstances were sufficient to lead a reasonable arrestee to believe that the police would not be recording his call.

¶ 56     The interception of a conversation in which a person has a reasonable expectation of privacy constitutes a search within the meaning of the Fourth Amendment. *Katz v. United States,* 389 U.S. 347, 353 (1967). The United States Supreme Court has stated that each Fourth Amendment inquiry involves determining (1) whether the individual had an actual, subjective

expectation of privacy and (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances. *Smith v. Maryland,* 442 U.S. 735, 740 (1979); see also, *People v. Martin*, 2017 IL App (1st) 143255, ¶ 20.

¶ 57 Despite defendant's assertions to the contrary, it is clear that a motion to suppress based on the violation of the Fourth Amendment would not have been granted. Indeed, although defense counsel did not premise his objections to the admissibility of the recording on the Fourth Amendment, both the State, in arguing for the recording's admissibility, and the court, in ruling on admissibility, heavily relied on Fourth Amendment principles. The State first discussed the Fourth Amendment in its motion to reconsider the court's exclusion of the recording based on defense counsel's objection. In ruling on that motion, the trial court found that "looking at this from a *4th Amendment purpose*, does the defendant have a reasonable expectation of privacy? He was locked up. He is being detained. It is similar to being in the back of a squad car where the defendant knows he is not free to go and he is recorded." (Emphasis added.) When the court subsequently denied defense counsels separate motions for a mistrial, the court found that defendant did not have a reasonable expectation of privacy under the Fourth Amendment because he was detained at the time the recording was made. Finally, in denying defense counsel's motion for a new trial, the trial court found that the admissibility of the recording was a Fourth Amendment issue and that defendant did not have a reasonable expectation of privacy.

¶ 58 Accordingly, although defense counsel may not have framed his argument as one that implicated the Fourth Amendment, the trial court, after further input from the State, analyzed it as such an argument. Defense counsel also argued on Fourth Amendment grounds contending that the Fourth Amendment would apply and came "into play." Defense counsel structured his argument using the same factors defendant now contends support suppression under the Fourth

Amendment, such as the fact that defendant was left alone in the room, defendant was permitted to use the cellphone, and defendant was not aware he was being recorded. Indeed, defense counsel raised many of the same issues that defendant now asserts on appeal that defense counsel should have raised in the suppression motion. Nonetheless, the trial court looked to the totality of the circumstances and found that defendant did not have a reasonable expectation of privacy. Specifically, the court found that defendant did not have a reasonable expectation of privacy because he was detained, knew he was not free to leave, and was in an interrogation room at a police station. The court observed that the recording equipment in the room was not hidden and consisted of a "bubble" camera positioned directly across from where defendant was sitting. Thus, defendant has failed to demonstrate that the trial court's ruling on this matter would have been any different had the same objections been raised in a motion to suppress based solely on Fourth Amendment grounds. Despite the fact that defense counsel seemed reluctant to raise Fourth Amendment concerns, the trial court nonetheless undertook a Fourth Amendment analysis and found no Fourth Amendment violation that would preclude the admission of the recording. We find the court's ruling was proper irrespective of whether defense counsel objected to the admissibility of the recording as he did at trial or whether defense counsel raised the issue in a motion to suppress as defendant now contends counsel should have done.

¶ 59    We find the Seventh Circuit's holding in *United States v. Webster*, 775 F.3d 897 (7th Cir. 2014) instructive. In *Webster*, the defendant and an accomplice were arrested and placed in the backseat of a patrol car while police sought a search warrant for his residence. *Id.* at 900. For a couple hours, a police officer was in the patrol vehicle with the defendant and the accomplice. *Id.* At some point, the officer activated the internal video camera in the car to record all of the conversations in the vehicle. *Id.* The officer subsequently left the vehicle for approximately eight

minutes. *Id.* During those eight minutes, the defendant engaged in conversation with his accomplice in the backseat of the vehicle and placed several phone calls which were audible in the recording. *Id.* At trial, the government moved to enter the eight-minute recording and a transcript of the recording into evidence and the defense offered no objection. *Id.* The defendant was subsequently found guilty. *Id.*

¶ 60     On appeal to the Seventh Circuit, the defendant contended that the district court erred in admitting the recording and transcript because the recording violated his Fourth Amendment rights. *Id.* at 903. The Seventh Circuit noted that in order to succeed on this claim, the defendant had to show that he had a reasonable expectation of privacy in the conversation that took place in the backseat of the patrol car. *Id.* The Seventh Circuit found that although the defendant may have manifested a subjective expectation of privacy, by silencing his conversation when the officer was in the patrol vehicle, the "insurmountable obstacle" to his claim was whether the expectation was one that society accepted as reasonable. *Id.* The Seventh Circuit, relying on decisions from various other circuits, observed that patrol vehicles are "bristling with electronics in which the practical realities of the situation should be apparent to occupants." *Id.* at 903-04. The court further noted that it was increasingly common for patrol vehicles to possess recording devices and that a patrol vehicle is in essence a "mobile office" and the backseat is commonly used as a "temporary jail for housing and transporting arrestees and suspects." *Id.* at 904. The Seventh Circuit concluded that "[g]iven the nature of the vehicle and the visible presence of electronics capable of transmitting any internal conversations, the expectation that a conversation within the vehicle is private is not an expectation that society would recognize to be reasonable." *Id.*

¶ 61     In this case, defendant was placed in an interrogation room, rather than a patrol vehicle. However, we find that the same considerations discussed by the Seventh Circuit in *Webster* apply

- 23 -

in equal force here. Like patrol vehicles, interrogation rooms in police stations are equipped with recording devices and used as "temporary jail[s]" to house arrestees and suspects. The interrogation room, like the patrol vehicle, was also equipped with visible recording equipment. The "practical realities" of being placed in an interrogation room after being detained "should be apparent to occupants." Indeed, if the patrol vehicle is a "mobile office," for police, where an arrestee should expect to be recorded, then an interrogation room, located at the police officer's actual office, should be accorded even less ambiguity. Although defendant in this case, like the defendant in *Webster*, appeared to believe that his conversation was private, based on his statement that he would not be talking the way that he was if there were someone in the room with him, his subjective expectation of privacy cannot overcome the "insurmountable obstacle" that society would not view the expectation of privacy as reasonable. Thus, "[g]iven the nature of the [interrogation room] and the visible presence of electronics capable of transmitting any internal conversations, the expectation that a conversation within the [interrogation room] is private is not an expectation that society would recognize to be reasonable."

¶ 62    Defendant attempts to distinguish *Webster*, asserting that, although a detainee can expect to be recorded in a police station, this is not an "absolute" rule, which will apply regardless of the circumstances. Defendant asserts that the circumstances in this case, particularly the fact that the officers left defendant alone in the room, provided him with a cellphone to make a call, and were not in the process of interrogating him, gave defendant the impression that he would have temporary privacy despite being in custody.

¶ 63    In support of this proposition, defendant relies on *Gennusa v. Shoar*, 879 F. Supp. 2d 1337 (M.D. Fla. 2012) and *State v. Munn*, 56 S.W. 3d 486 (Tenn. 2001). Both of these cases are distinguishable from the case at bar. In *Gennusa*, the plaintiff was in an interview room at the

police station with his attorney as they were preparing an affidavit related to the investigation. *Gennusa*, 879 F. Supp. 2d at 1342. The officer who was conducting the investigation, left the room and closed the door, leaving the plaintiff alone in the room with his attorney. *Id.* The interview room was recorded and actively monitored by the police officers, but neither the plaintiff nor his attorney were given any indication of that fact. *Id.* The court observed that the camera was "not obviously recognizable." *Id.* n.1. While no officers were present, the plaintiff and his attorney discussed matters related to the investigation. *Id.* The plaintiff and his attorney filed suit alleging that the police officers violated their Fourth Amendment rights and the Federal Wiretapping Act by recording their attorney-client conversations. *Id.* at 1343.

¶ 64    In addressing the plaintiffs' claims, the District Court started "from the premise that an expectation of privacy is reasonable when a lawyer and her client speak alone about privileged matters." *Id.* at 1347. The District Court found that it was not "dispositive" that the plaintiffs' conversation took place in a police interview room "because the need for confidential attorney-client communications and the informed legal assistance they facilitate is no less pressing in a police station or jailhouse setting than in other circumstances." *Id.* at 1348. The District Court also found that an expectation of privacy is more reasonable where the police take actions during an interview or interrogation that suggest that a suspect's conversations will be private. *Id.* at 1348-49. The District Court found this was "especially true" because people generally believe that conversations with their attorneys will be kept privileged and confidential. *Id.* at 1349. The District Court noted that the attorney clearly believed that their conversations were private and it was reasonable for the plaintiff to rely on his attorney's opinions regarding confidentiality and attorney-client privilege. *Id.* The District Court also observed that the attorney was an experienced defense attorney in the area and would not have expected, based on her experience, that her conversations

with her client were being actively monitored and recorded when no officers were present in the room. *Id.* The court concluded that the "surreptitious" recording of the conversations between the plaintiff and his attorney violated the Fourth Amendment and constituted an interception of an oral communication under the Wiretapping Act. *Id.*

¶ 65    In this case, unlike in *Gennusa*, defendant was not speaking to his attorney in the interrogation room. Instead, defendant appeared to be speaking to friends and family. Thus, the underlying premise in that case that an expectation of privacy is reasonable when a lawyer and her client speak alone about privileged matters is not present here. Moreover, the recording equipment in that case was "not obviously recognizable." In contrast, the recording device here consisted of a "bubble" camera that was positioned directly across from where defendant was sitting. Accordingly, we find the analysis in *Gennusa* inapplicable to the case at bar.

¶ 66    In *Munn*, the defendant arrived at the police station with his parents and sister at the request of the police to provide information about an ongoing investigation. *Munn*, 56 S.W. 3d at 489. The defendant and his father were placed in an interview room. *Id.* On a table in the interview room was a visible audio tape recorder. *Id.* However, unknown to the defendant and his father, the interview room was also equipped with a video camera that was hidden in a clock on the wall and hidden microphones in the ceiling. *Id.* Before interviewing the defendant, an officer told the defendant that he was turning on the tape recorder on the table. *Id.* The officer also told the defendant that he was not under arrest and that the defendant could leave at any time. *Id.* The officers later conducted a second interview of defendant with the same process of activating the tape recorder on the table. *Id.* at 490. During this second interview, defendant's mother came into the interview room to speak with the officers. *Id.* at 490-91. The officer asked defendant's mother, "Do you want to talk to us or do you want to talk him [defendant] by himself?" *Id.* at 491. The

other officer asked defendant, "Do you want to talk to your momma? Or do you want to talk to us" adding "Do you want to talk to your momma by yourself?" *Id.* Defendant responded, "Yeah." *Id.* Defendant asked the officers to turn off the tape recorder before they left the room. *Id.* at 494-95. The officers then left the room and closed the door. *Id.* at 491. Defendant then made an inculpatory statement to his mother which the officers monitored and recorded using the hidden surveillance equipment. *Id.*

¶ 67    The Tennessee Supreme Court first found that defendant had a subjective expectation of privacy because defendant appeared voluntarily at the police station, was told that he was free to leave at any time, and was not under arrest. *Id.* at 494. The court also observed that prior to talking to his mother alone, defendant requested that the audio tape recorder on the table be turned off and the officers complied before leaving the room and closing the door. *Id.* at 494-95. The court noted that since the camera and microphones were hidden, there was no visible indication that someone could listen to the private conversation between defendant and his mother. *Id.* at 495. The court concluded that, "[t]he police officers' collective actions in turning off the audio tape recorder at the defendant's request; asking if he wanted to talk alone with his mother; excusing themselves from the room; and closing the door both deceived and assured the defendant and his mother that they would be free to talk in private without anyone hearing their conversation." *Id.* The court next addressed whether defendant's subjective expectation of privacy was one that society would recognize as reasonable under the circumstances. *Id.* The court found that the defendant's subjective expectation of privacy was reasonable because the officers "both deceived and assured" the defendant and his parents that they were free to talk in private. *Id.* at 946. The court observed that the defendant and his mother relied on "the officers' assurances of privacy." *Id.*

¶ 68    In this case, by contrast, defendant's expectation of privacy was not reasonable. Unlike the defendant in *Munn*, defendant in this case was in custody, was not free to leave at any time, did not come to the police station voluntarily, and was arrested pursuant to an arrest warrant. Moreover, the officers did not deceive defendant by deactivating the only visible recording equipment in the room at his request, giving him the mistaken belief that his conversation would not be recorded only for the officers to use hidden surveillance equipment to record the conversation. Rather, the only recording equipment in the interrogation room was plainly visible and defendant never asked that it be deactivated. Indeed, the police officers in this case made no assurances to defendant that his cellphone conversation would be private. Defendant suggests that the officer's comment upon entering the room while he was on the phone that he had already allowed defendant to speak on the phone for "seven [minutes]" suggests some sort of agreement between defendant and the officer that defendant would be permitted to speak on the phone for a period of time in private. However, although the comments by the officer suggest that he allowed defendant to speak on the phone, there is no allegation or suggestion in the record that the officer told him that he could speak in private or falsely assured him that his conversation would not be recorded. As such, we find the reasoning in *Munn* is inapplicable to the case at bar.

¶ 69    Accordingly, we conclude that defendant has failed to show that he suffered prejudice as a result of counsel's alleged deficient performance by failing to demonstrate that the unargued suppression motion would have been successful. The circumstances in this case show that defendant did not have a reasonable expectation of privacy in his conversation in the interrogation room and, thus, there were no grounds to argue for the suppression of the recording on Fourth Amendment grounds. The trial court's comments establish that the court would have rejected a

motion to suppress on this basis, and we find that such a ruling would have been proper under the circumstances.

¶ 70                                    iii. The Outcome of the Trial

¶ 71    Finally, we find that defendant has failed to establish prejudice as a result of his counsel's alleged deficient performance because defendant has failed to demonstrate that the result of his trial would have been different if the recording had been suppressed. Defendant asserts that the result of his trial would have been different because although his statements on the recording did not amount to a confession, it was close enough to "give any actual confession a run for its money." Defendant points out that on the recording, he suggested personal knowledge of the offense and witnesses and discussed potential evidence. Defendant asserts that the recording was "devastating" to any hope of a defense case in a case that hung entirely on the testimony of witnesses and there was no physical evidence.

¶ 72    We find defendant's assertions unpersuasive. Three witnesses who were part of the dice game, Duwan, Jackson, and Addison, all gave similar accounts of the murder including defendant arguing with Darius over the $2, defendant leaving the trap house, and defendant returning and shooting Darius in the stomach while yelling at him about owing defendant money. This series of events is also consistent with the statements given by Zake and Hayes. We acknowledge that the witnesses recanted the majority of their statements at trial and the State introduced their statements as prior inconsistent statements. This court has recognized, however, that "[p]rior inconsistent statements alone may be sufficient to support a conviction," and it is the duty of the trier of fact to resolve the conflicts in the statements and determine which is more credible. *People v. Williams*, 332 Ill. App. 3d 693, 696 (2002). The previous inconsistent statements alone were sufficient to prove defendant's guilt beyond a reasonable doubt. Because the statements were admitted under

section 115-10.1 (725 ILCS 5/115-10.1 (West 2016)), a finding defendant does not challenge, "a finding of reliability and voluntariness is automatically made" and no additional analysis is necessary. *People v. Morrow*, 303 Ill. App. 3d 671, 677 (1999).

" '[I]t is the jury's decision to assign weight to the statement and to decide if the statement was indeed voluntary, after hearing the declarant's inconsistent testimony.' [citations]. 'Once a jury or trial court has chosen to return a guilty verdict based upon a prior inconsistent statement, a reviewing court not only is under no obligation to determine whether the declarant's testimony was 'substantially corroborated' or 'clear and convincing,' but it may not engage in any such analysis.' " *Id.*

¶ 73 The jury also heard evidence of Darius' dying declaration that he was shot by "Antonio over on Wallace." The State presented evidence that defendant lived on South Wallace Avenue at the time of the shooting. Defendant points out that there was no physical evidence linking him to the shooting. However, Hayes testified that defendant hid the gun under the bed in his bedroom. Officers later recovered that gun. Although a firearms expert was unable to determine whether the gun recovered fired the bullets that struck Darius, he identified the gun as a "Taurus .38 Special five shot revolver" with no hammer. This is consistent with Duwan and Zake's description of the gun that they saw defendant holding. Duwan described the gun as a "[.]38 revolver with no hammer to it. It was a snub nose" and Zake described it as a ".38 snub nose wood grip handle, Blue Steel" revolver. Thus, the evidence of presented in this case of defendant's guilt was not nearly as tenuous as defendant suggests.

¶ 74 Nonetheless, defendant raises the baseless contention that the entirety of the State's case may have been based on a conspiracy among the witnesses to place the blame on defendant, where Jackson was the true perpetrator. There is simply no support for this theory anywhere in the record.

Further, the theory is undercut by the fact that every witness recanted at trial and refused to identify defendant as the shooter, circumstances that would be inconsistent with a conspiracy to falsely place the blame for the shooting on defendant. Accordingly, defendant cannot show prejudice because defendant has failed to demonstrate that even if the recording had been suppressed, it would have changed the outcome at trial in light of the overwhelming evidence presented in this case. *People v. Madej*, 177 Ill. 2d 116, 156 (1997).

¶ 75                                    B. Sentencing

¶ 76    Defendant next contends that in the event we do not reverse his conviction and remand for a new trial on the basis of his trial counsel's ineffectiveness, we should alternatively remand the matter for an evidentiary hearing so that the trial court may appropriately consider defendant's youth and its attendant characteristics in determining his sentence. Defendant asserts that he was 22 years old at the time of the offense, and, pursuant to *People v. Harris*, 2018 IL 121932, the court should have held an evidentiary hearing to determine whether the 45-year mandatory minimum sentence was unconstitutional as applied to defendant's specific facts and circumstances. Defendant acknowledges that he did not raise the issue of an evidentiary hearing before the trial court and this court has generally found that an as-applied challenge of the type defendant seeks to raise cannot be raised for the first time on appeal, but defendant asserts that his trial counsel was ineffective in failing to raise this argument at sentencing.

¶ 77                               1. Alabama v. Miller

¶ 78    In *Miller*, the Supreme Court held that mandatory life sentences for juveniles violate the eighth amendment's prohibition against cruel and unusual punishment. *Miller*, 567 U.S. at 489. *Miller* requires sentencing courts in homicide cases to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in

prison." *Id.* at 480. The Supreme Court expanded on its decision in *Miller* in *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016). In *Montgomery*, the Court stated that *Miller* did not prohibit all life sentences for juveniles, but reserved life sentences for "the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 734. Throughout the decision, the court repeatedly stated that the decision in *Miller* applied only to juvenile offenders sentenced to "mandatory life without parole." *Id.* at ___, 136 S. Ct. at 726, 732, 733.

¶ 79    In *People v. Reyes*, 2016 IL 119271, our supreme court expanded the holding of *Miller*, finding that *Miller* applied to so-called "*de facto*" life sentences for juveniles. The supreme court found that such sentences violate *Miller* where the sentence is so long that it "amounts to the functional equivalent of life." *Id.* ¶ 9. Recently, in *People v. Buffer*, 2019 IL 122327, ¶ 40, our supreme court determined that a prison term of 40 years or more is considered a *de facto* life sentence.

¶ 80                          i. Young Adults Under Miller

¶ 81    As more defendants brought challenges to their sentences under *Miller*, young adults, in addition to juveniles, sought to have their sentences invalidated on the basis of Miller principles. See, *e.g.*, *People v. House*, 2021 IL 125124, *People v. White*, 2020 IL App (5th) 170345, *People v. Suggs*, 2020 IL App (2d) 170632, *People v. Handy*, 2019 IL App (1st) 170213, *People v. LaPointe*, 2018 IL App (2d) 160903, *People v. Pittman*, 2018 IL App (1st) 152030. Defendants in these cases generally raise challenges to their sentences under the eighth amendment, as expressly provided in *Miller*, and under the proportionate penalties clause of the Illinois Constitution. Our supreme court has recognized, however, that eighth amendment "claims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected." *Harris*, 2018 IL 121932, ¶ 61

(collecting authorities). However, whether a young adult defendant has a cognizable claim under the proportionate penalties clause is less clear. Similar to the eighth amendment, the proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I. § 11. A challenge under the proportionate penalties clause "contends that the penalty in question was not determined according to the seriousness of the offense." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). Some decisions of this court have suggested that the proportionate penalties clause may provide greater *Miller*-based protections for young adult offenders than those afforded by the eighth amendment. See *LaPointe*, 2018 IL App (2d) 160903, ¶¶ 51-53, (noting inconsistency about whether the eighth amendment and proportionate penalties clause are co-extensive and should be interpreted in "lockstep"). Defendants in such cases argue, as defendant here, that there is little distinction between juvenile offenders just under the age of 18 and offenders who are barely older. The defendants also cite to emerging science regarding brain development suggesting that brain development does not stop in young adults until their mid-20s.

¶ 82    The supreme court opened the door for such arguments in *People v. Thompson*, 2015 IL 118151. In *Thompson*, the 19-year-old defendant shot and killed his father and a woman who was inside his father's house. *Id.* ¶ 4. After the court found the defendant guilty of two counts of first degree murder, he was sentenced to a term of natural life imprisonment. *Id.* ¶ 7. This court affirmed the defendant's conviction and sentence on direct appeal. *Id.* ¶ 8. The defendant filed several postconviction pleadings, including a petition pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2010)) that was the subject of the supreme court's ruling. *Id.* ¶¶ 9-14. In that petition, the defendant raised due process violations and claims of ineffective assistance of counsel. *Id.* ¶ 14. On appeal, however, the defendant abandoned those claims and

instead asserted that his mandatory life sentence was unconstitutional pursuant to *Miller* under both the eighth amendment and the proportionate penalties clause. *Id.* ¶¶ 16-17. This court rejected the defendant's contentions, finding that his as-applied constitutional challenge was not properly before the court because it was raised for the first time on appeal. *Id.* ¶ 18.

¶ 83 The supreme court granted the defendant leave to appeal and agreed with the appellate court's conclusion that defendant forfeited his as-applied challenge to his sentence under *Miller* by raising it for the first time on appeal. *Id.* ¶ 39. The court noted that the defendant relied on the "evolving science" of juvenile maturity and brain development, but the defendant failed to establish how this "evolving science" applied to the circumstances of his case. *Id.* ¶ 38. The court noted that the circuit court was the appropriate tribunal for developing the factual record to adequately address defendant's claim. *Id.* The court stated, however, that the defendant was "not necessarily foreclosed" from raising his constitutional challenge in the circuit court and noted that the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) was "expressly designed to resolve constitutional issues." *Id.* ¶ 44. The court concluded that "we express no opinion on the merits of any future claim raised by defendant in a new proceeding." *Id.* ¶ 44.

¶ 84 The supreme court again addressed a young adult offender's claim pursuant to *Miller* in *Harris*, 2018 IL 121932. In *Harris*, the 18-year-old defendant received a 76-year sentence for first degree murder and aggravated battery with a firearm. *Id.* ¶ 1. The defendant contended, for the first time in his direct appeal, that his sentence violated the proportionate penalties clause. ¶ 17. This court vacated defendant's sentence finding that '[w]hile we do not minimize the seriousness of [defendant's] crimes, we believe that it shocks the moral sense of the community to send this young adult to prison for the remainder of his life, with no chance to rehabilitate himself into a useful member of society.' " *Id.* ¶ 18 (quoting *People v. Harris*, 2016 IL App (1st) 141744, ¶ 69,

*aff'd in part, rev'd in part*, *Harris*, 2018 IL 121932). On appeal, the supreme court noted that the defendant was raising an as-applied challenge to his sentence. *Harris*, 2018 IL 121932, ¶ 37. The court stated that it was therefore "paramount" that the record be sufficiently developed in terms of the defendant's specific facts and circumstances. (Internal quotation marks omitted). *Id.* ¶ 39. The court noted that defendant did not raise his as-applied challenge in the trial court and thus the trial court did not hold an evidentiary hearing where it could make findings of fact regarding defendant's specific circumstances. *Id.* ¶ 40.

¶ 85    The court found that because the defendant was 18 years old at the time of the offense, *Miller* did not apply directly to his circumstances. *Id.* ¶ 45. As in *Thompson*, the supreme court determined that the record was not sufficiently developed to address the defendant's claim that *Miller* applied to his particular circumstances. *Id.* ¶ 46. Despite the defendant's arguments to the contrary, the supreme court found that the record was not sufficiently developed to address his as-applied challenge because the record contained "only basic information about defendant, primarily from the presentence investigation report." *Id.* The court noted that an evidentiary hearing was not held and the trial court did not make any findings of fact on the "critical facts" needed to determine whether *Miller* applied to the defendant as an adult. *Id.* The court concluded that the defendant's as-applied challenge was premature because the record did not contain evidence about how the evolving science on juvenile maturity and brain development that the Supreme Court cited in *Miller* applied to the defendant's specific facts and circumstances. *Id.* The court noted, however, as it did in *Thompson*, that the defendant was "not necessarily foreclosed" from raising an as-applied challenge in another proceeding, such as in a petition under the Act. *Id.* ¶ 48.

¶ 86    Defendant here, like the defendants in *Thompson* and *Harris*, raises an as-applied challenge to his sentence. He maintains that he was only 22 years old at the time of the offense and had a

troubled upbringing. We find, however, that defendant, at 22 years old at the time of the offense, does not have a cognizable *Miller*-based claim, even under the more lenient standards suggested by the supreme court in *Thompson* and *Harris*. As noted, defendant relies on the growing trend, legally and scientifically, to afford additional weight to the qualities of youth in sentencing young adults. We acknowledge this trend, and note that panels of this court have expanded such protections to offenders 18 and even 19 years old. See, *e.g.*, *People v. Ruiz*, 2020 IL App (1st) 163145; *People v. Johnson*, 2020 IL App (1st) 171362. These considerations, however, have not been extended to offenders who are more than 21 years old at the time of the offense, even where the defendant has presented evidence of significant intellectual disability, which defendant here does not allege. See, *e.g.*, *People v. Clark*, 2021 IL App (3d) 180610.

¶ 87    We find support for this conclusion in recent enactments of the Illinois General Assembly, which has approved a variety of legislative enactments endorsing special consideration for youthful offenders older than 18. For instance, the General Assembly passed Public Act 100-1182, which provided that an offender under 21 years of age at the time of the commission of certain offenses would be eligible for parole review. See Pub. Act 100-1182 (eff. June 1, 2019) (adding 730 ILCS 5/5-4.5-110). Specifically, a qualifying offender under the age of 21 who committed a first degree murder would be eligible for parole review after serving 20 years of the sentence, but offenders serving natural-life sentences are excluded. *Id.* Indeed, this court cannot ignore the growing sentiment that in some circumstances young adult offenders may be afforded special sentencing considerations similar to those provided by *Miller*. However, even under these more lenient standards, the line for youthful offenders is clearly drawn at 21 years old at most. Defendant can point to no authority drawing the line any older than that, and our research reveals none. While courts have been hesitant to extend the *Miller* line of cases to offenders just barely over the age of

18 (see, *e.g.*, *White*, 2020 IL App (5th) 170345 (rejecting the 20-year-old defendant's proportionate penalties challenge to his sentence under the Act), *Handy*, 2019 IL App (1st) 170213 (rejecting the "18½"-year-old defendant's proportionate penalties challenge to his sentence under the Act), *LaPointe*, 2018 IL App (2d) 160903 (rejecting the 18-year-old defendant's proportionate penalties challenge to his sentence under the Act), *Pittman*, 2018 IL App (1st) 152030) (rejecting the 18-year-old defendant's proportionate penalties challenge to his sentence)), it is a much greater leap to extend it to a 21 year old, and an even greater leap to apply it to a 22-year-old offender, such as defendant here (*People v. Williams*, 2021 IL App (1st) 190535 (rejecting the 22-year-old defendant's contention that his sentence was unconstitutional under the proportionate penalties clause); *Suggs*, 2020 IL App (2d) 170632, ¶ 35 (rejecting the 23-year-old defendant's claim that his sentence violated the proportionate penalties clause under *Miller* and related cases)).

¶ 88    Finally, we observe that in arguing in mitigation at defendant's sentencing hearing, defense counsel asserted that defendant was a "young person" and the "emerging body of literature states that the brain continues to develop well into yours 20s and they suggest approximately 25 or 26 is when you are finally fully developed." Defense counsel contended that defendant was in that range and therefore there was a possibility of him being returned to productive citizenship.

¶ 89    In rendering defendant's sentence, the court noted that defendant was 22 years old at the time of the shooting, and that he "was a young man, but certainly not a juvenile." The court also stated that in determining the sentencing, it considered "the youth of the defendant, youth in the sense of he was 22 at the time of the offense." Thus, defendant's youth was brought to the attention of the trial court and trial court explicitly stated that it considered defendant's youth in rendering his sentence. The court ultimately determined that defendant's age did not warrant a finding that a sentence of more than 40 years was unconstitutional, and, as discussed above, we cannot say that

such a finding was unwarranted. Accordingly, we find that the 22-year-old defendant is not entitled to an evidentiary hearing where the court can consider his youth and its attendant characteristics under *Miller*.

¶ 90                                                    III. CONCLUSION

¶ 91      For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 92      Affirmed.